BROOKDALE HOMES, INC., RESPONDENT, v. J. CORY JOHNSON, TOWN CLERK, ET AL., APPELLANTS.

Submitted October 25, 1940—Decided May 1, 1941.

For the respondent, *William Huck, Jr.*

For the appellants, *Edward C. Pettit.*

PER CURIAM.

The judgment under review herein should be affirmed, for the reasons expressed in the opinion delivered by Mr. Justice Perskie in the Supreme Court.

HEHER, J. (Dissenting.) I vote to reverse the judgment.

The local zoning ordinance established what was denominated a "Small Volume Residential Zone A," limited in residential use to the "single detached house * * * by not more than one family," and to accessory and other uses conceded to be in keeping therewith, with a proviso that "no building" therein "shall be erected to a height in excess of 35 feet" or "with its roof ridge less than 26 feet above the building foundation," excluding "a false front, cupola, tower or similar part of a building" in the computation of the minimum height thus prescribed; and the question for decision is whether this regulation is *ultra vires* the municipality. I entertain the view that it is a valid exercise of power.

Zoning now has express constitutional recognition; and the earlier cases (*e. g., Ignaciunas* v. *Risley,* 98 *N. J. L.* 712; affirmed, sub nom., *State* v. *Nutley,* 99 *Id.* 389, and *H. Krumgold & Sons* v. *Jersey City,* 102 *Id.* 170) do not reveal the governing principle, and serve only to point what was deemed to be the need for and therefore the motive underlying the amendment of the State Constitution (article IV, section VI, paragraph 5) adopted at a special election held on September 20th, 1927.

I have the conviction that the amendment did not invest the legislature with authority not theretofore possessed by it. By the constitution (article III, paragraph 1; article IV, section 1, paragraph 1), the people of the state conferred upon the legislature full sovereign authority except as therein limited; and this clearly comprehends the police power, *i. e.*, the inherent right of sovereignty so to order the affairs of the people as to meet the common essential need. There is no *residuum* of sovereign power, apart from the police, invoked by this amendment for the enlargement of the general legislative function as theretofore laid down in our organic law. The police power does not have its genesis in a written constitution. It is an indispensable attribute of our society. It was possessed by the state sovereignties before the adoption of the Federal Constitution. *Mayor, &c., of New York* v. *Miln*, 11 *Pet.* 102; 9 *L. Ed.* 648.

The police authority does not lend itself to precise definition, for its quality and scope are commensurate with the public exigency arising from ever changing social and economic conditions. Neither the Fourteenth Amendment nor any other provision of the Federal Constitution serves to limit the *quantum* of the power. "Both property and liberty are held on such reasonable conditions as may be imposed by the governing power of the state in the exercise of those powers, and with such conditions the Fourteenth Amendment was not designed to interfere." *Lochner* v. *New York*, 198 *U. S.* 45; 25 *S. Ct.* 539; 49 *L. Ed.* 937. This constitutional mandate "was not intended to curtail the powers of the states to so amend their laws as to make them conform to the wishes of their citizens, to changed views of administration, or to the exigencies of their social life. It may be readily supposed that the inhabitants of each state understand perfectly their own local needs and interests, and, with the facilities with which the constitutions of the several states may be amended, it is scarcely possible that any evil which might be occasioned by an improvident amendment would not be readily redressed." *Bollin* v. *Nebraska*, 176 *U. S.* 83; 20 *S. Ct.* 284; 44 *L. Ed.* 382. See, also, *Nebbia* v. *New York*, 291 *U. S.* 502; 54 *S. Ct.* 505; 78 *L. Ed.* 940; 89 *A. L. R.* 1469.

It has been said that the "great end for which men entered into society was to secure their property;" yet that right is subject to abridgement by "public law for the good of the whole." *Boyd* v. *United States,* 116 *U. S.* 616; 6 *S. Ct.* 524; 29 *L. Ed.* 746. This public right of reasonable regulation for the common good is denominated the police power. Chief Justice Shaw early declared it to be "a settled principle, growing out of the nature of well-ordered society," that all property is "held subject to those general regulations which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law, as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient. * * * The power we allude to is rather the police power; the power vested in the legislature by the constitution, to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the Commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power than to mark its boundaries, or prescribe limits to its exercise." *Commonwealth* v. *Alger,* 7 *Cush.* 53, 84. And in *Leonard* v. *State,* 100 *Ohio St.* 456; 127 *N. E. Rep.* 464, it was held that "The dimensions of the government's police power are identical with the dimensions of the government's duty to protect and promote the public welfare. The measure of police power must square with the measure of public necessity. The public need is the polestar for the enactment, interpretation, and application of the law. If there appears in the phrasing of the law and the practical operation of the law a reasonable relation to the public need, its comfort, health, safety, and protection, then such act is constitutional, unless some express provision of the constitution be clearly violated in the operation of the act. Moreover the growth of the police power must from time to time conform to the growth of our

social, industrial, and commercial life. You cannot put a strait-jacket on justice any more than you can put a strait-jacket on business."

As the state "develops politically, economically, and socially, the police power likewise develops, within reason, to meet the changed and changing conditions." *Miller* v. *Board of Public Works,* 195 *Cal.* 477; 234 *Pac. Rep.* 381; 38 *A. L. R.* 1479. In *Des Moines* v. *Manhattan Oil Co.,* 193 *Iowa* 1096; 184 *N. W. Rep.* 823; 23 *A. L. R.* 1322, the power was delineated thus: "With the changing conditions necessarily attendant upon the growth and density of population and the ceaseless changes taking place in method and manner of carrying on the multiplying lines of human industry, the greater becomes the demand upon that reserve element of sovereignty which we call the police power, for such reasonable supervision and regulation as the state may impose, to insure observance by the individual citizen of the duty to use his property and exercise his rights and privileges with due regard to the personal and property rights and privileges of others. * * * Such duty even though it involves restrictions upon the so-called natural rights of every individual, is the first and most imperative obligation entering into what we call the social compact. Without it there can be no such thing as organized society or civilized government. Naturally, what regulations may reasonably be required or imposed for that purpose by the constituted authorities vary with the varying conditions with which our lawmakers have to deal, and, subject only to constitutional limitations, the state, acting by its legislature, has the right to select the subjects of regulation and prescribe rules for making such regulations effective."

The cited amendment of the State Constitution did not curtail the pre-existing particular legislative power exerted by the statute and the ordinance. Rather, the design was specifically to reaffirm an authority embraced in the prior grant of legislative power that, by the course of judicial decision, had been challenged in material aspects. By it the legislature was invested with power to "enact general laws under which municipalities, other than counties, may adopt zoning ordinances limiting and restricting to specified dis-

tricts and regulating therein, buildings and structures, according to their construction, and the nature and extent of their use," an authority "deemed to be within the police power of the state." And the statute enacted pursuant thereto empowers the several municipalities, by ordinance, to "limit and restrict to specified districts," and to "regulate therein, buildings and structures according to their construction, and the nature and extent of their use," considered as "within the police power," including "the right to regulate and restrict the height, number of stories, and sizes of buildings, and other structures, the percentage of lot that may be occupied, the sizes of yards, courts, and other open spaces, the density of population, and the location and use and extent of use of buildings and structures for trade, industry, residence, or other purposes;" and, "For any or all of said purposes," to "divide the municipality into districts of such number, shape, and area as may be deemed best suited to carry out the purposes" of the act, and, "within such districts," to "regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings or other structures," provided that all "Such regulations shall be uniform for each class or kind of buildings or other structures throughout each district, but the regulations in one district may differ from those in other districts." The "purposes in view" are outlined thus: "Such regulations shall be made in accordance with a comprehensive plan and designed for one or more of the following purposes: to lessen congestion in the streets; secure safety from fire, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; to avoid undue concentration of population. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout" the municipality. *Pamph. L.* 1928, *p.* 696; *R. S.* 1937, 40:55-30, 40:55-31, 40:55-32.

In my view, the regulation in question does not transcend this grant of authority. The ordinance embodies a compre-

hensive zoning scheme embracive of the whole of the municipality. It is stipulated that the "Small Volume Residential Zone A comprises practically one-half of the area" of the municipality, "is all located north of Bay avenue and contains most of" its "undeveloped land;" and the ordinance is assailed only in respect of the minimum height provision applicable to buildings erected in that zone. The regulation was designed to bar the "bungalow-type" dwelling house from a district delimited for single detached one-family dwelling houses. There is no contention that the inclusion of respondent's land within the district thus limited to single detached residences is unreasonable in the circumstances, or, for that matter, that this is not the most appropriate use of the land so zoned. The single point made is that the minimum height regulation does not bear "a substantial relation to public health, safety, morals or the general welfare," and therefore is not comprehended by the police power.

Evidently, the legislative purpose was to devote this land to its most suitable and appropriate use, and thus to advance the general welfare. The classification of dwelling houses according to type and size for the conservation of property values and as an integral part of general and comprehensive regulations to secure the "most appropriate use of land throughout" the municipality, is a valid exercise of the police power, if altogether reasonable for the attainment of those ends, for thereby the common need is subserved in matters of substance. And, while it is the prevailing rule that esthetic elements are not in themselves sufficient to warrant the invocation of the police power, the fact that they are also inducing considerations does not invalidate the regulation if otherwise within the sphere of that authority. *St. Louis Poster Adv. Co.* v. *St. Louis,* 249 *U. S.* 269; 39 *S. Ct.* 274; 63 *L. Ed.* 599; *Welch* v. *Swasey,* 214 *U. S.* 91; 29 *S. Ct.* 567; 53 *L. Ed.* 923; *Opinion of the Justices,* 234 *Mass.* 597; 127 *N. E. Rep.* 525; *Women's Kansas City St. Andrew Society* v. *Kansas City,* 58 *Fed. Rep.* (*2d*) 593; *Windsor* v. *Whitney,* 95 *Conn.* 368; 111 *Atl. Rep.* 354, 357; 12 *A. L. R.* 669. See, also, 43 *A. L. R.* 662, *note.* Police regulation on esthetic grounds is generally deemed to be an invasion of the right

of private property, but it would seem that on principle such is within the police power if so far promotive of the interests of the public at large, through the resultant community development and profit, as to outweigh the incidental restraint upon private ownership.

Where the action taken serves the good and welfare of the community at large, and is not so unreasonable as to be arbitrary or confiscatory, the ensuing interference with the use of private property is *damnum absque injuria*. The sweep of police power is generally co-extensive with the public need. It embraces such measures as are reasonably necessary to secure the essential, common, material and moral needs; and the correlative restrictions upon individual rights—either of person or of property—are mere incidents of the social order, considered a negligible loss compared with the benefits accruing to the community as a unit. Indeed, it is to be presumed that a wholly compensating individual advantage flows from the general betterment. While some of the earlier cases seem to confine the authority to such regulations as are needful for the public health, the public safety, and the public morals, such measures as are fairly requisite for the "public convenience" and the "general prosperity" are now considered as within the category. This reserve element of sovereignty embraces the measures essential to the general well-being. *Chicago, B. and Q. Railroad Co.* v. *Illinois,* 200 *U. S.* 561; 26 *S. Ct.* 341; 50 *L. Ed.* 596; *Bacon* v. *Walker,* 204 *U. S.* 311; 27 *S. Ct.* 289; 51 *L. Ed.* 499; *Eubank, Louisville and N. Railroad Co.* v. *Richmond,* 266 *U. S.* 137; 33 *S. Ct.* 76; 57 *L. Ed.* 156; *Euclid* v. *Ambler Realty Co.,* 272 *U. S.* 365; 47 *S. Ct.* 114; 71 *L. Ed.* 303; 54 *A. L. R.* 1016; *Gorieb* v. *Fox,* 274 *U. S.* 603; 47 *S. Ct.* 675; 71 *L. Ed.* 1228; *Nashville, C. and St. L. Railroad Co.* v. *Walters,* 294 *U. S.* 405; 55 *S. Ct.* 486; 79 *L. Ed.* 949; *Mansfield & Swett, Inc.,* v. *West Orange,* 120 *N. J. L.* 145; *Brandon* v. *Board of Commissioners of Town of Montclair,* 124 *Id.* 135; *affirmed,* 125 *Id.* 367; *State* v. *Hillman,* 110 *Conn.* 108; 147 *Atl. Rep.* 294; *Windsor* v. *Whitney, supra.*

The police authority has been termed "one of the most essential of powers, at times the most insistent, and always

one of the least limitable of the powers of government." *District of Columbia* v. *Brooke,* 214 *U. S.* 138; 29 *S. Ct.* 560; 53 *L. Ed.* 941. In *Noble State Bank* v. *Haskell,* 219 *U. S.* 104; 31 *S. Ct.* 186; 55 *L. Ed.* 112, Mr. Justice Holmes declared: "It may be said in a general way that the police power extends to all the great public needs. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare." Where the public interest is concerned, "preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property." *Miller* v. *Schoene,* 276 *U. S.* 272; 48 *S. Ct.* 246; 72 *L. Ed.* 568. Even though it may operate harshly upon an individual, the "imperative necessity" for this attribute of severeignty "precludes any limitation upon it when not exerted arbitrarily. A vested interest cannot be asserted against it because of conditions once obtaining. * * * To so hold would preclude development and fix a city forever in its primitive conditions. There must be progress, and if in its march private interests are in the way, they must yield to the good of the community. The logical result of petitioner's contention would seem to be that a city could not be formed or enlarged against the resistance of an occupant of the ground, and that if it grows at all it can only grow as the environment of the occupations that are usually banished to the purlieus." Such was the pronouncement of the Federal Supreme Court in sustaining a local ordinance, enacted as a police measure, prohibiting brickmaking within a designated area as against the contentions that it served to take, without due process of law, lands within the district containing valuable deposits of clay suitable for brickmaking which could not profitably be removed and manufactured into brick elsewhere, and were far more valuable for brickmaking than for any other purpose, and which had been used as a brickyard before its annexation to the municipality, and also that it constituted a denial of the equal protection of the laws. *Hadacheck* v. *Sebastian,* 239 *U. S.* 394; 36 *S. Ct.* 143; 60

*L. Ed.* 348, 356. See, also, *Reinman* v. *Little Rock,* 237 *U. S.* 171; 35 *S. Ct.* 511; 59 *L. Ed.* 900.

In *Ludgate* v. *Somerville,* 121 *Or.* 643; 256 *Pac. Rep.* 1043; 54 *A. L. R.* 837, it was found that "The general scheme of maintaining and perpetuating," by restrictive covenants in the deeds, a section of land "as a high class, exclusively residential district certainly promotes the general welfare." And the case of *Chicago, B. and Q. Railroad Co.* v. *Illinois, supra,* is authority for the proposition that the reclamation of land for cultivation, through a system of drainage, is a legitimate aspect of the police power for the promotion of public convenience and the general prosperity. The objective was considered so materially contributory to the common interest as to warrant the restraint upon the use of private property essential to its attainment.

If the regulation conserves the value of land in the public interest, and the means employed are reasonable and appropriate to that end, the consequent curtailment of individual use is but an incident of ownership of land in a society organized to serve the collective need. And it would seem to be a mere truism that a comprehensive and ordered system of physical development is indispensable to the realization of the primary purposes of municipal government. The collective welfare demands measures adapted to varying needs. Such I consider to be an essential local function. The essence of the statutory scheme is the dedication of lands, through the zoning process, to the uses best suited to the good of the community. To challenge this authority is to deny the principle that brought men together in civil society for their mutual benefit. The genius of organized government is the subordination of individual personal and property rights to the common good and welfare. *Mansfield & Swett, Inc.,* v. *West Orange, supra.* What in the comparatively simple society of a century ago would have been deemed an invasion of the right of private property is now generally regarded as of the substance of our modern communal life; for instance, the taking of lands for public parks. *Vide Olmstead* v. *Camp,* 33 *Conn.* 532.

This general power is directed to a legitimate end if it operates to protect a basic interest of society rather than to

serve one essentially private. As stated, all private property in a well-ordered civil society is held subject to the general regulations needful for the common good and welfare. The concentration of population in urban communities and the complexities of modern social life have given rise to new problems calling for the exercise of this reserve power which, though not variable either in quality or content, is yet sufficiently expansive to meet new conditions of common concern. "The general welfare may be tested by considerations of stabilization, orderliness and development in the forms, branches and grouping of the elements of residence, business and industry in community life;" and, "where any fair reason could be assigned for bringing legislation within its (the police power's) purview, the question of justice was for the legislature alone  *  *  *. A community's prosperity may depend upon convenience and expediency in the arrangement, allocation and layout of the diversified uses of property therein, as well as upon the orthodox reasons of health, safety and morals. It is true that 'the boundaries (of the police power) are to be determined by a consideration of specific instances as they are presented'  *  *  *, but the defendants have not demonstrated that the use they propose to make of their property may not be enjoined in furtherance of the town's welfare." *Stone* v. *Cray* (*N. H.*), 200 *Atl. Rep.* 517.

In determining whether the power has been exerted for the general convenience, prosperity and well-being, the regulations are not to be appraised separately, but as an integrated scheme of collective concern. Viewed as a related and ordered whole, are they fairly classable as in the service of a need reasonably deemed public in essence? The public effect of the individual regulation may ofttimes be imponderable, but when considered as a component part of a plan designed for communal betterment, its validity as a police measure is unassailable.

In the exercise of the authority, a large measure of discretion is of necessity vested in the legislative body to determine, not only what the public interest requires, but the means necessary for the protection of that interest. If a police regulation in a legitimate field keeps within the reasonable

demands of the occasion, neither the wisdom nor expediency of the measure is subject to judicial review. The legislature is primarily the judge of the need for the law, and every possible presumption in favor of its validity will be indulged. It will not be declared void unless its repugnancy to a constitutional limitation is so manifest as to leave no room for reasonable doubt. A legislative enactment should not be set aside unless its constitutional invalidity indisputably appears. *State Board of Milk Control* v. *Newark Milk Co.*, 118 *N. J. Eq.* 504; *Mansfield & Swett, Inc.*, v. *West Orange, supra.*

In *Brown* v. *Board of Appeals*, 327 *Ill.* 644; 159 *N. E. Rep.* 225; 56 *A. L. R.* 242, a regulation prescribing a minimum height°for buildings in a business district was read as intended to increase rather than to conserve property values; and it was struck down as in contravention of a grant of power limited, among other specifically enumerated powers not here pertinent, to the conservation of the "taxable values of land and buildings." It was also held that the "promotion or protection of refined esthetic taste is not among the purposes enumerated." Citing with approval the case of *Dorison* v. *Saul*, 98 *N. J. L.* 112, the conclusion was that the terms "regulate" and "limit" in the ordinance there considered did not confer power to prescribe a minimum height. Sufficient has been said to demonstrate that this is not an analogous adjudication; and the case of *Dorison* v. *Saul, supra,* is a decision rendered by our Supreme Court in 1922, interpreting a different and more restricted statutory provision, and, if it be read as denying the general authority here exercised, it is not expressive of the spirit of the constitutional amendment and the statute adopted thereafter.

Here, there was evidence tending to show that the use thus prescribed, considered in relation to the character and location of the land, and the existent dwelling houses and the general zoning scheme, is the most appropriate and suitable; and that the erection of the banned bungalow-type of structure upon the vacant land in the district would result in a depreciation of land values and a reduction of ratables to a degree materially affecting the public welfare. Respondent is the owner of "undeveloped" land in the district to the

extent of "about 3,000 feet frontage;" and it is proposed to use these plots, in large part at least, for the erection of bungalows to meet a "demand for all living rooms on one floor." The permit sought is for "a 4½ room house on the first floor, * * * living room, kitchen, bedroom, dining room and bath."

The classification in this respect is not unreasonable or arbitrary. I hold the opinion that the general zoning scheme takes the category of a reasonable regulation for public convenience, prosperity and welfare; and the particular provision is justly classable as an integral part of the plan. If, for reasons of public safety and the like, dwelling houses may be limited to a fixed maximum height, so also may a minimum height be prescribed if reasonably necessary to secure the use for which the land in the district is peculiarly suitable, considered from the standpoint of the community at large, and thus to conserve its character and value and promote the general prosperity and welfare. If not, dwellings even less in keeping with the character of the district, e. g., shacks and the like, would be unobjectionable. Can it be that our sovereignty is so circumscribed that one-room shanties may not be excluded from a community peculiarly suited to materially higher residential uses, and devoted to such, even though this radical departure will substantially depreciate property values and otherwise disserve the essential public interest? In this behalf, the difference between such structure and the common bungalow would seem to be one of degree merely and not of kind; certainly, such classification is not to be condemned as palpably unreasonable, arbitrary or oppressive. As said, we are not at liberty to nullify a legislative enactment unless its constitutional invalidity is not open to reasonable doubt. If there be such deficiency of fundamental power, there is no way by which a municipality may assure the permanency of the particular residential use appropriate to the locality, and thus to safeguard and maintain it from destructive uses. In *Bucsi* v. *Longworth Building and Loan Association,* 119 *N. J. L.* 120, 130, this court, in sustaining under the police power a statute that materially modified the obligation of contracts, declared that: "The state has an

important interest in the maintenance of real estate values because these values form the major base upon which its tax structure and its various political subdivisions rest," and that "The stability of the tax base over a term of years is vitally important to the state." So, also, for the political subdivision itself. While individual inconvenience and decrease in property values are frequently incidents of the legitimate exercise of the police power, here observance of the challenged regulations will plainly enhance land values.

Viewed as a whole, the regulations are designed, not for the special benefit of particular landowners, but for the material advancement of the entire community as a social, economic and political unit. It was incumbent on respondent to establish that the particular regulation constituted a deprivation of its property without due process of law or a denial of the equal protection of the laws; and it did not sustain that burden.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, DONGES, PORTER, COLIE, WELLS, RAFFERTY, JJ. 7.

*For reversal*—CASE, HEHER, DEAR, WOLFSKEIL, HAGUE, THOMPSON, JJ. 6.