DELAWANNA IRON AND METAL COMPANY, PLAINTIFF-APPELLANT, v. WALTER E. ALBRECHT, BUILDING INSPECTOR AND ZONING OFFICER OF THE CITY OF CLIFTON, AND MUNICIPAL COUNCIL OF THE CITY OF CLIFTON, DEFENDANTS-RESPONDENTS.

DELAWANNA IRON AND METAL COMPANY, PLAINTIFF-APPELLANT, v. WALTER E. ALBRECHT, BUILDING INSPECTOR AND ZONING OFFICER OF THE CITY OF CLIFTON, AND BOARD OF ADJUSTMENT OF THE CITY OF CLIFTON, DEFENDANTS-RESPONDENTS.

Argued March 10, 1952—Decided May 5, 1952.

*Mr. Samuel H. Nelson* argued the causes for appellant (*Mr. Irving Mandelbaum,* attorney).

*Mr. John G. Dluhy* argued the causes for respondents.

The opinion of the court was delivered by

HEHER, J. We are concerned here with the legal suffi-
ciency of a zoning regulation purporting to render the
existing use of plaintiff's lands nonconforming and therefore
inextensible.

For 20 years or more the plaintiff corporation has con-
ducted a scrap metal business on lands comprising 1½
acres situate in Clifton, New Jersey, in an industrial district
delineated by the local zoning ordinance, under a permit
issued pursuant to another ordinance regulating junk yards.
It has had ownership of the land for the past seven years.
It sells scrap metal in bales or bundles, principally to steel
mills; and it has undertaken the enlargement of its baling
facilities by the replacement of a 10-year-old press now
obsolete with a modern press to be housed in a new building.
The proposed building is also to contain lavatories and lockers
for the employees, and a small shop for tools and equipment.
The plant now represents an investment of upwards of
$100,000. The new building will cost in excess of $30,000,
and the press and mechanism for motive power, $74,000.
The baling process involves the use of acetylene torches and
shears, to cut the larger and heavier metal pieces to a size
conforming to the capacity of the present mechanical unit.
The result is "a square bundle to be shipped to the mill."
The baling press is a high compression machine powered by
a motor, pump and air compressor, all comprising an integral
unit. The old press measures approximately 90 inches by
38 inches; and the motor and compressor are housed in a
one-story cement block and frame building in size about
21½ feet by 18 feet. The structure in contemplation will
measure 14 feet in height, with a subsurface depth of 17 feet.
The building inspector refused a permit for the construction
of the building, and the landowner thereupon instituted this
civil action in lieu of the prerogative writ of *mandamus*
(A–94) to compel the issuance of the permit. The Superior
Court ruled that the use was within the prohibition of
Section 12 (g) of the zoning ordinance forbidding "additions

or extensions" to a "nonconforming building or use" in excess of 25 per cent of the occupied floor area, or 25 per cent of the cubical content of the building, or 25 per cent of the "service capacity" of the use, and suggested that application for a variance be made to the administrative agency. This was done; but the application was denied on the ground that such a grant would serve to enlarge a nonconforming use (in press capacity from between 20 to 50 tons per day to between 80 and 96 tons per day for automobile scrap and 96 and 200 tons per day for industrial steel) and contravene the policy of the zoning ordinance to contain nonconforming uses, even though Section 12 (g) limiting the enlargement of nonconforming uses, in effect when the application for a variance was made but later repealed, be deemed controlling. It was found that there was no jurisdiction under *R. S.* 40:55–39c, as amended by *L.* 1948, *c.* 305, *p.* 1223, and *L.* 1949, *c.* 242, *p.* 779. A recommendation of a variance to the governing body under *R. S.* 40:55–39d, as amended, was also refused for the same reason and on the additional ground that "an increase of capacity" would result "in a considerable increase in objectionable noise and smoke." The Superior Court, proceeding in lieu of the prerogative writ of *certiorari*, (A–95), found no "abuse of discretion" and declined to "substitute its judgment for that of a duly constituted public body." It dismissed an attack upon the validity of the regulation itself as "unfounded and without merit."

Section 11(a), III (f) of the zoning ordinance permits in industrial districts

"All other structures and uses except the following which are specifically prohibited:

\*  \*  \*  \*  \*  \*  \*  \*

"6. Junk yards, automobile graveyards, or dismantling plants, and the storage of second-hand materials for resale, except entirely within an enclosure no part of which is closer than 200 feet to a public street or road.

"7. The storage, baling or treatment of junk, old iron, rags, bottles or scrap paper, except within a building."

The plaintiff landowner maintains that the "building, pit, press, machinery and equipment constitute one structure for the single purpose" of "baling scrap metal"; that the "entire operation" is "within a building," and the use is therefore permissible under the cited exception of subsection 7. Defendants suggest that subsection 7 has reference merely to the "familiar 'junk man'" who makes a day-to-day house-to-house collection of "rags, bottles and junk" for individual resale or baling or bundling "for bulk resale," with or without a "machine, depending upon the material or desired size"; that plaintiff operates what is commonly known as a "junk yard," a use which utilizes the whole of plaintiff's lands as well as the buildings and involves "actual baling * * * in the open," even though "the machinery of the proposed unit would be housed and considered as one unit," and so the use "falls within the terms and regulations" of the cited subsection 6, and is nonconforming. It is said that subsection 7 makes no mention of "junk yards" or automobile "graveyards," while subsection 6 "specifically encompasses such businesses."

The rule of subsection 6 constitutes an arbitrary and unreasonable exercise of the police power comprehended in the constitutional and statutory zoning process. It does not serve the common good and welfare in any of the particulars set down in *R. S.* 40:55–32. The prohibition in industrial districts of junk yards, automobile "graveyards or dismantling plants," and the "storage of second-hand materials for resale" except "entirely within an enclosure" not closer in any part than 200 feet to a public street or road, does not bear a rational relation to the end to be served by zoning.

The regulation is defended as a public safety and health measure. It is said that the entrance to plaintiff's plant "directly abuts Route No. 3, an integral part of the State Highway System," and "If uncontrolled, the constant stream of truck traffic to and from the junk yard may create a traffic hazard," and also that the nonenclosure of such premises involves fire, safety and health hazards, especially to chil-

dren wanting in the discretion for self-protection, and therefore the regulation is directly related to the public health, safety, morals and general welfare. But it is quite obvious that the volume of truck traffic at the highway intersection leading to plaintiff's lands will remain the same whether the enclosed junkyard be located directly on the highway or 200· feet away, and the traffic hazards will be no less in the one case than in the other. Thus, the regulation does not constitute a reasonable requirement for the common well being in any particular substantially related to use zoning, and so it falls as an arbitrary interference with the right of private property.

It is not urged that this rule of the ordinance is supportable by aesthetic considerations alone. Indeed, the requirement of an enclosure would seem to be in part designed to this end and ample for the purpose in an industrial district. Apparently, the regulation has another motivation not legitimately related to zoning.

It is fundamental that there be a substantial relation between the restraint put upon the use of the lands and the public health, safety, morals, or the general good and welfare in one or more of the particulars involved in the exercise of the constitutional and statutory use-zoning process, and that the regulation be not discriminative; otherwise, there would be an unwarranted intrusion on the basic right of private property. The exercise of the police power in this and all other fields of action is contained by the rule of reason. Arbitrary action is inadmissible. There must be a rational relation between the means invoked and the public interest designed to be served. *Schmidt v. Board of Adjustment of Newark,* this day decided, 9 *N. J.* 405 (1952) ; *Collins v. Board of Adjustment of Margate City,* 3 *N. J.* 200 (1949). The law will not tolerate an invasion of the right of property under the guise of a police regulation in the professed interest of the public health or safety when it is manifest that such was not the object of the regulation. *New Jersey Good Humor, Inc., v. Bradley Beach,* 124 *N. J. L.* 162 (*E. & A.*

1940). The asserted public exigency must be real and not feigned.

■ Section 6 of the ordinance constitutes an arbitrary exercise of power and is void and ineffectual as a bar to the issuance of the building permit sought by plaintiff.

This is not to suggest that the fencing provision, standing alone, would be unreasonable.

The judgment in A–94 is accordingly reversed; and the cause is remanded for appropriate proceedings in conformity with this opinion.

The judgment in A–95 is vacated; and the cause is remanded with direction to dismiss the complaint as a necessary consequence of the invalidation of the regulation itself.

No. A–94:

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT and BURLING—4.

*For affirmance*—Justice WACHENFELD—1.

No. A–95:

*For vacation*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT and BURLING—4.

*For affirmance*—Justice WACHENFELD—1.