129 N.J. Super. 528 (1974)
324 A.2d 113
WESTFIELD MOTOR SALES CO., A NEW JERSEY CORPORATION, PLAINTIFF,
v.
TOWN OF WESTFIELD, THE BOARD OF ADJUSTMENT OF THE TOWN OF WESTFIELD AND GEORGE TZAMOS, THE BUILDING INSPECTOR OF THE TOWN OF WESTFIELD, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided July 12, 1974.
*529 Mr. Paul R. Williams, Jr. for plaintiff.
*530 Mr. Robert J.T. Mooney for defendants.
ACKERMAN, HAROLD A., J.S.C.
Plaintiff brings this action in lieu of prerogative writs pursuant to R. 4:69. By this suit it seeks a determination that defendant Town of Westfield's zoning ordinance is unconstitutional or, alternatively, that defendant Board of Adjustment of the Town of Westfield acted arbitrarily and capriciously in denying its application for a variance pursuant to N.J.S.A. 40: 55-39(c).
Plaintiff is a franchised Ford dealer operating its business in defendant town's G.B. (General Business) district. In line with Ford's national identification campaign, plaintiff applied to defendant building inspector for permission to erect on its premises five advertising signs. At the time it applied there were 15 or 16 signs of various types already existing on the premises, and concededly old and unsightly. Plaintiff wished to tear almost all of these down and replace them with the new ones which it had applied for.
The building inspector denied plaintiff's application and plaintiff then instituted a suit contending, among other things, that the sign ordinance was unconstitutional. In an unreported opinion dated January 22, 1971, Judge Feller held the ordinance invalid, essentially because it had been improperly enacted as part of defendant's general ordinances instead of having been enacted as part of defendant's zoning ordinances. The case was then remanded so that defendant could enact a new sign ordinance. Westfield Motor Sales Co. v. Westfield, Dkt. No. L-30894-69 (Law Div. 1971).
On April 13, 1971 defendant town adopted a new ordinance and plaintiff's suit was dismissed by consent of the parties. It is this ordinance which is now under attack.
Section 419 of the zoning ordinance of the Town of Westfield provides in pertinent part as follows:
B. Signs in the Residence Districts. The following signs are permitted in the Residence Districts:

* * * * * * * *
*531 2. Signs erected upon the premises of and for churches, charitable and civic organizations which shall not exceed twenty square feet in area.

* * * * * * * *
4. In the Garden Apartment Residence Districts one sign identifying the name of the garden apartment premises only which shall not exceed 16 square feet in area.

* * * * * * * *
5. Temporary Signs:
(a) One sign identifying the owner, architect, builder, realtor and contractor on premises on which a building is being constructed, altered or repaired. Such a sign shall not exceed 16 square feet in area.

* * * * * * * *
(b) One free-standing sign on a subdivision which has been approved by the Town Planning Board. Such a sign shall not exceed 24 square feet in area and shall be removed after residences have been constructed on 95% of the lots * * *. In no case shall any such subdivision sign be permitted after two years have elapsed from the time when the first sign was so erected.

* * * * * * * *
(c) One sign announcing that the premises on which it is located are available for sale or rental. Such a sign shall not exceed four square feet in area and shall be displayed only for so long as such premises are in fact available for sale or rental.

* * * * * * * *
6. All signs which are located in the Residence Districts may be of the free-standing type. All other signs in the Residence Districts are prohibited.
C. Signs in the Professional Office District.
The following signs are permitted in the Professional Office District:

* * * * * * * *
2. One sign upon the premises used for professional offices which shall not exceed ten square feet in area.

* * * * * * * *
D. Signs in Central-Business, General Business, Industrial Parks and Industrial Districts:
1. All signs permitted in the Residence and Professional Districts.
2. Signs which direct attention exclusively to a permitted business conducted on the premises * * *. Said sign shall comply with the following:
(a) One sign may be attached to the wall at each main public entrance of a building. Such sign shall not exceed the length of said wall nor a height of 3 feet.

* * * * * * * *
(c) Two business signs may be painted on the windows and/or doors of each business * * * provided that there shall be no more *532 than one such sign on each window or door, and the total area of all such signs shall not exceed 10 square feet.

* * * * * * * *
3. Signs required by law to be exhibited * * * provided the same do not exceed 6 square feet in total area.

* * * * * * * *
5. Non-illuminated signs displayed on the interior of windows to give notice of sales or special functions shall be permitted for 75 days each year. No more than 30% of the total area of the window on which such signs are displayed shall be covered.
6. A free standing sign for each entrance on parking lot premises which shall not exceed 10 square feet in area.

* * * * * * * *
E. General Regulations

* * * * * * * *
6. No wall sign shall project more than 5 inches beyond the building wall to which it is affixed.
7. No sign shall be above the top or beyond the ends of the wall surface upon which it is placed.

* * * * * * * *
F. Illumination.
1. All signs permitted by this ordinance may be illuminated unless otherwise provided herein.
After the adoption of this ordinance plaintiff again applied to defendant building inspector for permission to erect five signs. Sign No. 1 was to be a nonilluminated, wall-mounted sign running the length of the building and bearing the words "Westfield Ford." It was to project more than the five inches prescribed under section 419(E) (6), supra. Sign No. 2 was to be a freestanding sign of approximately 138 square feet in area bearing the single word "Ford." This contravened the ten-square-foot maximum allowed in the business district under Section 419 (D) (6). Plaintiff proposed that sign No. 3 be an internally illuminated, wall-mounted sign directing the customers to the body and paint area. This sign was also planned to project more than five inches. Sign No. 4 was to be a freestanding one of approximately 32 square feet bearing the words "Used Cars," and sign No. 5 was to be an internally illuminated, wall-mounted sign projecting almost eight feet from the building.
*533 On December 27, 1971 defendant building inspector again denied plaintiff's application because the proposed signs violated the ordinance. Plaintiff then appealed to defendant board for a variance under N.J.S.A. 40:55-39(c). A hearing was held on January 24, 1972 and at that time the application for sign No. 1 was withdrawn as plaintiff expected that the proposed sign would comply with the ordinance. The board denied the requested variances without making any findings of fact or stating any conclusions of law. No stenographic record of the hearing was made.
Plaintiff instituted the present action on March 8, 1972, and on January 8, 1973 Judge Steinbrugge ordered the matter remanded so that a verbatim record could be made and so that the board could set forth its findings of facts and conclusions of law.
Two hearings were held as a result of the remand. Plaintiff amended its application so that sign No. 2 would only be 52 square feet in area, the smallest sign of that type supplied by Ford. The testimony indicated that there were 37 other signs in the area all the same size. Evidently these were preexisting nonconforming uses. Plaintiff's witnesses testified that the purpose of the large freestanding sign was to make the dealership visible at a major intersection some distance away. However, this visibility was not essential for plaintiff's business; it was merely to make the premises more attractive and to maintain the present sales volume. The sign would radiate little glare due to its internal illumination. As for the internally illuminated, wall-mounted signs, plaintiff's expert testified that the five-inch projection provision effectively prohibited any such signs because industry standards mandated that internally illuminated signs be at least six inches thick. This factor would make it practically impossible to comply with the ordinance.
There was great opposition to plaintiff's application. Many residents of the area argued that the freestanding sign would visually project onto three residential streets. One resident, who had measured distances and lines of sight, indicated *534 that the large sign could not be seen from the intersection, as plaintiff had contemplated. Several persons viewed plaintiff's application as a "test case" in which an unfavorable precedent might be set for the future. The crux of the opposition was that the purpose of the ordinance was to preserve Westfield's colonial atmosphere; any variance granted would destroy that purpose notwithstanding the fact that the proposed signs would be more aesthetically pleasing than the signs presently in place.
An April 16, 1973 the board of adjustment denied the requested variance. It found as a fact that "the purpose of the proposed sign installations is to create uniformity of Ford Dealership signs throughout the country * * *" and that plaintiff "does not contend that the proposed new signs are necessary to increase or preserve business * * *." The board found that the purpose of the signs was modernization and beautification.
It therefore concluded that plaintiff had failed to establish unique or exceptional conditions constituting a hardship. It also stated that to permit the substitution of one set of nonconforming signs for another set simply to meet the needs of a national identity program would "substantially impair the corrective intent and prospective purpose of the Zoning Ordinance * * *."
Plaintiff alleges that the ordinance represents an illegal use of zoning power under N.J.S.A. 40:55-32, and that the ordinance is arbitrary and discriminatory. It prohibits signs over 10 square feet in area in the business zones, while permitting garden apartments up to 16 square feet, and churches up to 20 square feet. Defendants now concede that section 419 (E) (6), which prohibits signs from projecting more than five inches beyond the wall, is defective in that this requirement is realistically impractical when applied to internally illuminated, wall-mounted signs. Thus, this issue has become moot and is not presently before the court.
*535 We turn now to plaintiff's first contention. N.J.S.A. 40:55-32 provides that zoning regulations
shall be in accordance with a comprehensive plan and designed for one or more of the following purposes: to lessen congestion in the streets; secure safety from fire, flood, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality.
The record does not indicate any reason for enacting this ordinance except for the preservation of defendant town's uniqueness and character. The only purpose of the ordinance therefore is aesthetic, and this, plaintiff argues, is an impermissible purpose under the statute, supra.
The question plainly put is whether or not aesthetic considerations alone justify the exercise of the police power of the state. Nor is this issue a novel one. While it has been said that the "zoning power may not be exercised for purely aesthetic considerations," Piscitelli v. Scotch Plains Tp. Comm., 103 N.J. Super. 589, 597 (Law Div. 1968), our Supreme Court has stated that "the issue may be said to be unexplored in our State * * *." United Advertising Corp. v. Metuchen, 42 N.J. 1, 5 (1964). After reviewing the recent cases, this court today holds that defendant town may, within the scope of its police power, enact a zoning ordinance based solely upon aesthetic considerations.
The first New Jersey case dealing with aesthetics was Passaic v. Paterson Bill Posting Co., 71 N.J.L. 75 (Sup. Ct. 1904), rev'd 72 N.J.L. 285 (E. & A. 1905). Defendant was convicted of violating an ordinance which mandated that certain signs be no more than eight feet high and not less than ten feet from the street line. The lower court did not find the ordinance invalid, but the Court of Errors and Appeals reversed the conviction saying:
*536 It is probable that the enactment of section 1 of the ordinance was due rather to aesthetic considerations than to considerations of the public safety. No case has been cited, nor are we aware of any case which holds that a man may be deprived of his property because his tastes are not those of his neighbors. Aesthetic considerations are a matter of luxury and indulgence rather than of necessity, and it is necessity alone which justifies the exercise of the police power to take private property without compensation. [72 N.J.L. at 287; emphasis supplied]
Passaic was cited numerous times, and the underscored language often quoted as the rationale behind striking ordinances enacted for aesthetic purposes. See, e.g., Pfister v. Clifton, 133 N.J.L. 148, 152 (Sup. Ct. 1945); O'Mealia Outdoor Advertising Co. v. Rutherford, 128 N.J.L. 587, 591 (Sup. Ct. 1942); Cooper Lumber Co. v. Dammers, 125 A. 325, 327, 2 N.J. Misc. 289, 292 (Sup. Ct. 1924); Levy v. Mravlag, 96 N.J.L. 367, 371 (Sup. Ct. 1921); Romar Realty Co. v. Haddonfield, 96 N.J.L. 117 (Sup. Ct. 1921); People ex rel. Wineburgh Advertising Co. v. Murphy, 195 N.Y. 126, 135, 88 N.E. 17, 20 (1909).
Yet, despite this negative judicial attitude, some courts justified aesthetic zoning on various other grounds. See, e.g., St. Louis Gunning Advertisement Co. v. City of St. Louis, 235 Mo. 99, 137 S.W. 929 (1911), app. dism. per stipulation, 231 U.S. 761, 34 S.Ct. 325, 58 L.Ed. 470 (1913) (billboards endanger health and promote immorality); City of Providence v. Stephens, 47 R.I. 387, 133 A. 614 (1926) (apartments in residential areas are fire hazards). As was stated in Perlmutter v. Greene, 259 N.Y. 327, 332, 182 N.E. 5, 6 (1932), "[b]eauty may not be queen, but she is not an outcast beyond the pale of protection or respect. She may at least shelter herself under the wing of safety, morality or decency." However, many authors recognized that this reasoning was nothing more than fiction. See, e.g., Dukeminier, "Zoning for Aesthetic Objectives: A Reappraisal," 20 Law & Contemp. Prob. 218 (1955); Landels, "Zoning: An Analysis of Its Purposes and Its Legal Sanctions," 17 A.B.A.J. 163 (1931). And *537 so, this superficial approach was supplemented "by the more direct technique of expanding `general welfare' to include aesthetic considerations." Comment, 64 Colum. L. Rev. 81, 85 (1964).
In New Jersey this issue was discussed in Justice Heher's dissenting opinion in Brookdale Homes, Inc. v. Johnson, 123 N.J.L. 602 (Sup. Ct. 1940), aff'd o.b. 126 N.J.L. 516 (E. & A. 1941). The court there affirmed the invalidation of an ordinance which prohibited the construction of a building with a height in excess of 35 feet, and Justice Heher urged the court to adopt a more modern view:
And, while it is the prevailing rule that aesthetic elements are not in themselves sufficient to warrant the invocation of the police power, the fact that they are also inducing considerations does not invalidate the regulation if otherwise within the sphere of that authority. [Citations omitted.] Police regulation on aesthetic grounds is generally deemed to be an invasion of the right of private property, but it would seem that on principle such is within the police power if so far promotive of the interests of the public at large, through the resultant community development and profit, as to outweigh the incidental restraint upon private ownership. [126 N.J.L. at 521-522]
It was not until Lionshead Lake, Inc v. Wayne Tp., 13 N.J. Super. 490 (Law Div. 1951), rev'd 10 N.J. 165 (1952), app. dism. 344 U.S. 919, 73 S.Ct. 386, 97 L.Ed. 708 (1952), that the majority accepted Justice Heher's dissent as the law in New Jersey.[1] The court upheld an ordinance fixing minimum floor space for various types of housing, saying: "so long as the zoning ordinance was reasonably designed, by whatever means, to further the advancement of a community as a social, economic and political *538 unit, it is in the general welfare and therefore a proper exercise of the zoning power." 10 N.J. at 172. Thus, "the courts in conformance with the constitutional provisions and the statutes hereinbefore cited take a broad view of what constitutes general welfare." Id. at 174. See Schmidt v. Newark Bd. of Adjustment, 9 N.J. 405 (1952); Duffcon Concrete Products, Inc. v. Cresskill, 1 N.J. 509 (1949), rev'g 137 N.J.L. 81 (Sup. Ct. 1948); Pequannock Tp. v. De Wilde, 21 N.J. Super. 517 (App. Div. 1952).
The unique feature of Lionshead was that it focused attention upon the interrelationship of aesthetic considerations and the public welfare goal of preserving property values. See Steinbach, "Aesthetic Zoning: Property Values and the Judicial Decision Process," 93 N.J.L.J. 869, 875 (1970); Comment, 11 Duquesne L. Rev. 204, 227 (1972). Justice Jacobs, in his concurring opinion, stated that the provisions of the ordinance
were influenced in considerable part by aesthetic considerations which I believe to be entirely proper. [Citations omitted.] In the Point Pleasant case I recently expressed the view, to which I adhere fully, "that it is the public interest that our communities, so far as feasible, should be made pleasant and inviting and that primary considerations of attractiveness and beauty might well be frankly acknowledged as appropriate, under certain circumstances, in the promotion of the general welfare of our people." And in the Brookdale case Justice Heher expressed the view that, on principle, regulation on aesthetic grounds would seem to be within the police power "if so far promotive of the interests of the public at large, through the resultant community development and profit, as to outweigh the incidental restraint upon private ownership." [Citations omitted.] To the extent that our earlier cases express outmoded narrower doctrines (see Passaic v. Paterson Bill Posting Co., 72 N.J.L. 285, 287 (E. & A. 1905)) they ought to be expressly disavowed." [10 N.J. at 176-177]
Plaintiff argues that under New Jersey law an ordinance must be related to the preservation of property values and may not be enacted solely for aesthetic reasons. See, e.g., United Advertising Corp. v. Metuchen, supra, 42 N.J. at 6; Vickers v. Gloucester Tp. Comm., 37 N.J. 232, 247-248 *539 (1962), cert. den. 371 U.S. 233, 83 S.Ct. 326, 9 L.Ed.2d 495 (1963); Napierkowski v. Gloucester Tp., 29 N.J. 481, 494 (1959); Pierro v. Baxendale, 20 N.J. 17, 27-30 (1955); Fischer v. Bedminster Tp., 11 N.J. 194, 205 (1952); Livingston Tp. v. Marchev, 85 N.J. Super. 428, 433 (App. Div. 1964), certif. den. 44 N.J. 412 (1965), app. dism. 382 U.S. 201, 86 S.Ct. 393, 15 L.Ed.2d 269 (1965); N.Y. Central R.R. v. Ridgefield, 84 N.J. Super. 85, 93 (App. Div. 1964); Loveladies Property Owners Ass'n, Inc. v. Barnegat City, 60 N.J. Super. 491, 499 (App. Div. 1960), certif. den. 33 N.J. 118 (1960); Hankins v. Rockleigh, 55 N.J. Super. 132, 137 (App. Div. 1959); Clary v. Eatontown, 41 N.J. Super. 47, 67 (App. Div. 1956); Piscitelli v. Scotch Plains Tp. Comm., supra, 103 N.J. Super. at 597; Frankel v. C. Burwell, Inc., 94 N.J. Super. 53, 59-60 (Law Div. 1967); Klotz v. Englewood Cliffs Bd. of Adj., 90 N.J. Super. 295, 298 (Law Div. 1966). However, we disagree.
An analysis of the foregoing cases indicates that aesthetic zoning has been given judicial approbation only when clothed with other legal raiment which masked its true purpose. One author states:
When courts have had the opportunity to utilize the aesthetic factor and conceptually clarify its basic essence, they have often avoided the real aesthetic issue by resourcefully providing an expedient alternative to justify the exercise of the police power and to substantiate the result achieved. [Comment, 11 Duquesne L. Rev., supra at 204]
This court today holds that it is now appropriate to permit a municipality, under proper safeguard, to legally deal with the problem without subterfuge. Zoning solely for aesthetic purposes is an idea whose time has come; it is not outside the scope of the police power.
Embodied within the theory of police power is a concept of "utilitarianism," a theory of balancing individual interests against the general welfare of the community. See Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 387-389, 47 *540 S.Ct. 114, 71 L.Ed. 303 (1926); Steinbach, 93 N.J.L.J., supra at 875; Note, 18 U. Fla. L. Rev. 430, 431 (1965). And, as was said in Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954):
The concept of the public welfare is broad and inclusive. [Citation omitted.] The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way." [at 33, 75 S.Ct. at 102][2]
Furthermore, it has been argued that not only does the police power include aesthetics but, in fact, that all planning and zoning is essentially aesthetic in nature, growing, as it did, out of "the city beautiful movement of the early 1900's." Norton, "Police Power, Planning and Aesthetics," 7 Santa Clara Lawyer 171, 172 (1967).
The modern view is to completely and openly accept aesthetic regulation for its own sake. See Dukeminier, supra at 219; Norton, supra at 182; Steinbach, supra at 872. The underlying reasoning is that times are changing and values are shifting. As Judge Finch pointed out in his dissenting opinion when the majority of the Court of Appeals of New York voided an ordinance prohibiting construction of certain billboards, "[c]ircumstances, surrounding conditions, changed social attitudes, newly-acquired knowledge, do not alter the Constitution, but they do alter our view of what is reasonable. Restrictions upon the use of property, which were deemed unreasonable in 1909, are regarded today as entirely reasonable and natural." Mid-State Advertising Corp. v. Bond, 274 N.Y. 82, 87, 8 N.E.2d 286, 288 (1937).
*541 Oregon adopted this approach in Oregon City v. Hartke, 240 Or. 35, 400 P.2d 255 (1965). In that case the court upheld an ordinance based solely upon aesthetics, saying:
* * * there is a growing judicial recognition of the power of a city to impose zoning restrictions which can be justified solely upon the ground that they will tend to prevent or minimize discordant and unsightly surroundings. This change in attitude is a reflection of the refinement of our tastes and the growing appreciation of cultured values in a maturing society. The change may be ascribed more directly to the judicial expansion of the police power to include within the concept of "general welfare" the enhancement of the citizen's cultural life. [240 Or. at 46, 400 P.2d 261]
And this approach was also taken by the Appellate Court of Michigan in Sun Oil Co. v. City of Madison Heights, 41 Mich. App. 47, 199 N.W.2d 525 (1972). There the appellate court reversed the trial court's holding that an ordinance restricting the height of free-standing signs to 20 feet was invalid. Although mentioning the public safety as one possible consideration, the court said:
The modern trend is to recognize that a community's aesthetic well-being can contribute to urban man's psychological and emotional stability. It is true that the question of what is beautiful and pleasing is for each individual to decide. We should begin to realize, however, that a visually satisfying city can stimulate an identity and pride which is the foundation for social responsibility and citizenship. These are proper concerns of the general welfare. [Citation omitted.] Madison Heights has determined that its citizens' well-being will be served best by preventing the visual pollution which occurs when high-rise signs dot major thoroughfares. [41 Mich. at 53, 199 N.W.2d at 529]
See also, State v. Diamond Motors, Inc., 50 Hawaii 33, 429 P.2d 825 (Sup. Ct. 1967); Jasper v. Commonwealth, 375 S.W. 2d 709 (Ky. App. 1964).
Nor does this approach to aesthetics do violence to the majority opinion in United Advertising, as the issue was specifically left open as we noted previously. In fact, Justice Hall, when faced with an ordinance admittedly enacted for *542 purely aesthetic purposes, suggested in that case that New Jersey embrace the new trend.
It seems to me that courts ought to face up to realities squarely and begin to give frank recognition to aesthetics as an appropriate basis in some areas for exercise of the police power to attain proper community objectives. See Dukeminier, "Zoning for Aesthetic Objectives: A Reappraisal," 20 Law and Contemporary Problems 218 (1955). While this has actually been done for a considerable time, judicial opinions generally expound some other reason. Many police power regulations are upheld where the true but unexpressed basis is that the activity or condition is considered by practically everyone to be an eyesore or offensive to some other sense. Many zoning regulations actually rest on aesthetic considerations, such as those prescribing suburban residential setback and yard distances.
The concept is admittedly a most difficult one to put into fair practice. Beauty and taste are almost impossible to legislate affirmatively on any very broad scale because they are generally such subjective and individual things, not easily susceptible of objective, non-arbitrary standards. See Vickers v. Township Committee of Gloucester Township, 37 N.J. 232, dissenting opinion, at p. 269 (1962). But that does not mean that they cannot be judicially recognized in some situations as proper community objectives. [42 N.J. at 11]
One author suggests that United Advertising indicates that New Jersey has recognized "the confusion of aesthetics with economics but * * * has not taken steps to redefine its position in uniformity with its recognition of the confusion." Note, 18 U. Fla. L. Rev., supra at 437.
Admittedly, some authorities disagree with zoning solely for aesthetics. In People v. Stover, 12 N.Y.2d 462, 240 N.Y.S. 2d 734, 191 N.E.2d 272 (1963), Judge Van Voorhis of the Court of Appeals of New York dissented when the majority upheld a zoning ordinance prohibiting the hanging of clothes on clotheslines in front or side yards abutting a street. He stated:
This ordinance is unrelated to the public safety, health, morals or welfare except insofar as it compels conformity to what the neighbors like to look at. Zoning, important as it is within limits, is too rapidly becoming a legalized device to prevent property owners from doing whatever their neighbors dislike. Protection of minority rights is as essential to democracy as majority vote. In our age of conformity *543 it is still not possible for all to be exactly alike, nor is it the instinct of our law to compel uniformity wherever diversity may offend the sensibilities of those who cast the largest numbers of votes in municipal elections. The right to be different has its place in this country. The United States has drawn strength from differences among its people in taste, experience, temperament, ideas, and ambitions as well as from differences in race, national or religious background. Even where the use of property is bizarre, unsuitable or obstreperous it is not to be curtailed in the absence of overriding reasons of public policy. The security and repose which come from protection of the right to be different in matter of aesthetics, taste, thought, expression and within limits in conduct are not to be cast aside without violating constitutional privileges and immunities. This is not merely a matter of legislative policy, at whatever level. In my view, this pertains to individual rights protected by the Constitution. [12 N.Y.2d at 472, 240 N.Y.S. 2d at 742, 191 N.E.2d at 278]
See also, Presnell v. Leslie, 3 N.Y.2d 384, 165 N.Y.S.2d 488, 144 N.E.2d 381 (Ct. App. 1957) (Judge Van Voorhis dissenting); Reid v. Architectural Board of Review, 119 Ohio App. 67, 192 N.E.2d 74 (App. Ct. 1963) (Judge Corrigan dissenting). Or, in the words of Judge Targonski, in his partially dissenting opinion in Sun Oil Co. v. City of Madison Heights, supra:
We will all live to rue the day that public officials are permitted to meddle in private affairs on aesthetic considerations since as the majority opinion states each person has his own yardstick for the evaluation of matters aesthetic. We should not open this door which could very well lead to a situation of a most highly regulated society in the world at the whim and caprice of individual officials without any proper measure for a limitation on such individual values rather than values prescribed by law. [41 Mich. App. at 57, 199 N.W.2d at 531]
However, this prophecy need not necessarily be self-fulfilling. Ordinances based on aesthetics may still be scrutinized by the courts to determine their reasonableness in achieving their goals. Less confusion will result if the courts accept aesthetic zoning per se, instead of purporting to accept it and then dismissing it as inadequate. Indeed, when an ordinance is based purely upon aesthetics, an opponent may *544 better aim his attack towards the imperfections in the ordinance instead of being sidetracked towards the less substantial question of whether or not some factor such as safety or health is involved. The attack may be directed, without diversion, at the reasonableness of the ordinance. See Anderson, "Regulation of Land Use for Aesthetic Purposes  An Appraisal of People v. Stover," 15 Syr. L. Rev. 33, 40 (1964).
In the instant case there is nothing wrong with a large or small business concern seeking to advertise its wares in a uniform manner, either nationally or locally. Those who live in an urban megalopolis are no strangers to the jungle of signs which daily compete for their attention. Undoubtedly, some signs by virtue of their design are more aesthetically pleasing than others, regardless of size. But a municipality may perceive that a plethora of signs of a certain size, no matter how tasteful, can have an undesirable cumulative effect upon the well-being of the entire community. Is the citizenry then powerless to deal with this problem when it beholds the fruits of a philosophy of noninterference? We think not. In such a situation, assuming the municipality acts reasonably and fairly in the process of balancing the various interests, the right of the businessman to promote his goods may become subservient to the community's interest in its appearance.
Plaintiff contends that the municipality has acted unfairly and unreasonably and that the restrictions imposed upon the business area, within the context of the entire ordinance, are arbitrary and discriminatory. Again, we must disagree. The ordinance in question does not do violence to the businessman's right to advertise his wares; it merely regulates this right by limiting the size of certain signs he may desire to use. We need not, at this point, analyze the various provisions of the ordinance. Suffice it to say that what we have here is a basic disagreement over the reasonableness of ten square feet as the maximum area permitted free-standing *545 signs in the business district. (We note again that defendants have conceded the invalidity of that portion of the ordinance dealing with the projection of a sign more than five inches beyond the wall and have acknowledged their duty to remedy the problem.)
Plaintiff produced Dr. Robert James Claus as its key expert witness. Plaintiff contends, and defendants readily admit, that Dr. Claus demonstrated considerable expertise on the subject of signs. Having listened to Dr. Claus, this court has no quarrel with this assessment. His knowledge of the subject is truly encyclopedic.
Dr. Claus found the ordinance to be an example of "municipal harassment" of the business community. He found the section dealing with free-standing signs to be particularly opprobrious because of the ten-square-foot size limitation. Characterizing this provision as "pedestrian oriented," he was of the opinion that 35 to 40 square feet represented the minimum, considering the necessity of maintaining legibility, visibility and readibility for automobile drivers. Characterizing section D(6), supra, as the "primary cancer" in the ordinance he attacked this provision as a safety hazard. Defendant's expert, Edward C. Chase, disagreed with this assessment and also pointed out that certain New Jersey communities had ordinances which were more stringent than Westfield's.
In the opinion of this court a fair reading of Dr. Claus' testimony necessarily leads one to the conclusion that he believes a businessman has the right to erect various types of signs unconstrained by the community's desires. This laissez-faire approach to the problem runs counter to sound decisional law in this area, which views with approbation an exercise of legislative judgment by a municipality, which is unattended by arbitrariness.
It is curious to note, as defendants have pointed out in their supplemental brief, that Dr. Claus had no quarrel with the City of Las Vegas, Nevada portraying a certain public image on a thoroughfare known as the "Strip," but denied *546 Westfield the same aesthetic privilege. Thus, in effect, plaintiff's expert cries foul when a community attempts by regulation to portray itself with an aura of relative placidity. In this vast land there is much to be said for diversity of treatment of the problems at hand by various communities. As stated in United Advertising:
The most that can be said with respect to the proof is that reasonable men can disagree as to whether the addition of off-premise signs would disserve the general welfare. Such policy questions are committed to the judgment of the local legislative bodies. As we have said so many times with respect to zoning and other legislative or quasi-legislative decisions, a judge may not interfere merely because he would have made a different policy decision if the power to decide had been his. A court can concern itself only with an abuse of delegated legislative power, and may set aside the legislative judgment only if arbitrariness clearly appears. [42 N.J. at 8]
We are not faced with any claim on the part of plaintiff that the ordinance would have an adverse economic effect on its business. Plaintiff's distress apparently is centered solely on its inability to erect free-standing signs of a certain size in conformance with Ford's national identification program.
On balance, this court found that Dr. Claus' testimony as to signs, while impressive, left much to be desired and was substantively unpersuasive. The ten-square-foot maximum area permitted free-standing signs in the business area is not unreasonable.
Reasonableness is a two-sided coin. On one side is the adverse impact of the restriction upon him who asserts its unreasonableness. On the other are the social and policy considerations which led to the adoption of the regulation. The final assessment of reasonableness involves a balancing of the considerations on one side of the coin as against those on the other. The more cogent the social pressures impelling the adoption of the restriction the greater the permissible abrasion of the interests of the individual affected. [Clary v. Eatontown, 41 N.J. Super. at 71]
Plaintiff alleges that the sign ordinance is violative of equal protection because certain other uses are permitted *547 to erect larger signs. It is true that freestanding signs upon church property may be up to 20 square feet, and garden apartments are allowed up to 16 square feet. However, garden apartments are permitted only one freestanding sign, whereas a business may have one sign for each parking lot entrance. Similarly, a valid legislative distinction can be made between businesses operated for a profit and churches and other nonprofit organizations. Furthermore, although certain temporary signs and subdivision signs may be 16 and 24 square feet respectively, these must be removed after a specified length of time. Plaintiff has not demonstrated by a clear showing that there is anything arbitrary or unreasonable about these legislative distinctions. See Harvard Enterprises, Inc. v. Madison Tp. Bd. of Adjustment, 56 N.J. 362 (1970); Kozesnik v. Montgomery Tp., 24 N.J. 154 (1957).
Plaintiff argues that the ordinance must fall for vagueness, claiming that certain definitional terms are ambiguous. A reading of the ordinance indicates that this argument is specious, and the court concurs with defendant's characterization of plaintiff's expert's testimony in this regard as "nit-picking."
Zoning ordinances are strongly presumed valid, Kozesnik v. Montgomery Tp., supra at 167, and, as the foregoing discussion indicates, plaintiff has failed to overcome this presumption. The ordinance is therefore constitutional.
We turn finally to plaintiff's application for a variance pursuant to N.J.S.A. 40:55-39(c). The statute provides that plaintiff show undue hardship were the variance to be denied, and that plaintiff also demonstrate that the granting of the variance would not substantially impair the intent and purpose of the zoning ordinance. Nor may the court substitute its judgment for that of the board of adjustment's. See Kramer v. Sea Girt Bd. of Adjustment, 45 N.J. 268, 296 (1965). The court should set aside the determination of the board only when it is arbitrary, capricious and unreasonable. Id.
*548 In the instant case, we hold that the determination of the board was neither arbitrary, capricious nor unreasonable. Plaintiff's own testimony was that it wanted the signs only to be more visible and to maintain its volume. The board, based upon these facts, determined that no hardship existed. And furthermore, the board was not convinced that plaintiff had satisfied the negative criteria under the statute. Thus, the record supports the findings and conclusions of the board, and the denial of the variance will be sustained.
Judgment is hereby rendered for defendants.
NOTES
[1] Previous to Lionshead the Passaic rationale was still followed. See, e.g., Delawanna Iron and Metal Co. v. Albrecht, 9 N.J. 424 (1952); Wright v. Vogt, 7 N.J. 1 (1951); Vassallo v. Orange, 125 N.J.L. 419 (E. & A. 1949), rev'g 124 N.J.L. 153 (Sup. Ct. 1940); Point Pleasant Beach v. Point Pleasant Pavilion, 3 N.J. Super. 222 (App. Div. 1949); Hendlin v. Fairmount Construction Co., 8 N.J. Super. 310 (Ch. Div. 1950).
[2] We note, however, that this expansive view of the general welfare was not within the context of a zoning case but concerned an eminent domain problem under the Fifth Amendment.