NEWMAN SIGNS, INC., a North Dakota Corporation, Plaintiff, Appellee, and Cross-Appellant,

v.

Walter R. HJELLE, as North Dakota State Highway Commissioner, and North Dakota Highway Corridor Board, Defendants, Appellants, and Cross-Appellees.

Civ. No. 9394.

Supreme Court of North Dakota.

July 3, 1978.

Rehearing Denied Aug. 3, 1978.

Edmund G. Vinje II, of Hjellum, Weiss, Nerison, Jukkala & Vinje, Jamestown, for plaintiff, appellee, and cross-appellant Newman Signs, Inc.

Albert A. Wolf, Sp. Asst. Atty. Gen., Bismarck, for defendant, appellant, and cross-appellee Hjelle.

Max D. Rosenberg, Sp. Asst. Atty. Gen., Bismarck, for defendant, appellant, and cross-appellee North Dakota Highway Corridor Board.

VOGEL, Justice.

This appeal involves the interpretation of the Federal "Highway Beautification Act

of 1965," 23 U.S.C. § 131, and the North Dakota Highway Beautification Act, Chapter 24-17, North Dakota Century Code. There were three actions in the district court, two commenced by Newman Signs, Inc. (hereinafter Newman), and one by Walter R. Hjelle, as North Dakota State Highway Commissioner (hereinafter Commissioner). The North Dakota Highway Corridor Board (hereinafter Board) was a defendant in an action brought by Newman. By agreement, the three actions were consolidated into one, in which an amended complaint was filed, and the consolidated action was tried in Cass County district court. The amended complaint in the consolidated action contains five counts, each relating to a separate category of outdoor advertising signs, with a sixth count as to damages. The trial related only to the first five counts, with the sixth count reserved for future determination.

All parties appealed from the judgment of the district court. In addition to questions of interpretation of the Federal and State statutes, constitutionality of the latter is also challenged. We reverse the judgment of the district court in part and remand for further proceedings.

The Federal Act was enacted in 1965 and was designed to persuade the States, by means of financial incentives, to use their police power to control the erection and maintenance of outdoor advertising structures adjacent to the Interstate and primary highway systems. In order to avoid losing 10 percent of the State's share of Federal-aid highway funds (approximately $3,000,000 per year in North Dakota, we are advised), each State must provide for "effective control" of advertising structures situated within 660 feet of the nearest edge of the right-of-way and visible from the main traveled way of the system.[1]

Effective control had to be provided by January 1, 1968, in order to comply with the Act as originally drafted. "Effective control" was defined in the Act, 23 U.S.C. § 131(c), as meaning that:

" . . . after January 1, 1968, such signs, displays, and devices shall, pursuant to this section, be limited to (1) directional and other official signs and notices, which signs and notices shall include, but not be limited to, signs and notices pertaining to natural wonders, scenic and historical attractions, which are required or authorized by law, which shall conform to national standards hereby authorized to be promulgated by the Secretary [of Commerce, later by the Secretary of Transportation] hereunder, which standards shall contain provisions concerning the lighting, size, number, and spacing of signs, and such other requirements as may be appropriate to implement this section, (2) signs, displays, and devices advertising the sale or lease of property upon which they are located, and (3) signs, displays, and devices advertising activities conducted on the property on which they are located."[2]

Section 131(b) allowed the Secretary to waive the 10-percent penalty if a State had not complied with requirements for effective control, under certain conditions. It provided:

"Whenever he determines it to be in the public interest, the Secretary may suspend, for such periods as he deems necessary, the application of this subsection to a State."

The Federal Act further provides, in subsection (d), that advertising signs, displays, and devices could be maintained within 660 feet of the nearest edge of the right-of-way, but only in areas which are zoned industrial or commercial under authority of State law, or in unzoned commercial or industrial areas as may be determined by agreement between the several States and the Secretary, provided that the signs, displays, and devices conform in size, lighting, and spacing to the agreement between the several States and the Secretary which is

---

1. This provision was expanded later to include signs beyond 660 feet and visible from the highway.

2. This definition was subsequently amended by wording not material to this appeal.

consistent with customary use. In the case of North Dakota, there was considerable controversy over several years as to the contents of any agreement to be signed in conformity with this subsection, and the agreement was finally signed on January 19, 1972. The district court determined that there was no control over advertising signs until the latter date.

The Act also provides for payment of just compensation to the owners of outdoor advertising signs along the Interstate and primary highway system upon the removal of certain enumerated advertising structures, with the Federal Government providing 75 percent of the compensation. However, in order to be eligible for the 75-percent share, a State must have entered into an agreement with the Federal Government to control the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate system [subdivision (j)].

Subdivision (e) provides for a grace period until July 1, 1970, of signs lawfully in existence on September 1, 1965, and for a five-year grace period of nonconforming signs later erected lawfully.

The first session of the North Dakota Legislature after the passage of the Federal Act was the 1967 legislative session. Between the passage of the Federal Act and the convening of the 1967 legislative session, the Commissioner, after obtaining an opinion of the North Dakota Attorney General that he was authorized to do so, issued rules and regulations governing outdoor advertising along Interstate and primary highways and prohibiting

" . . . establishment of billboard advertising along interstate and primary highways in the State of North Dakota . . . within 660 feet from the nearest edge of the right of way unless permission . . . is requested in writing and . . . granted in writing by the North Dakota State Highway Commissioner."

This was on December 3, 1965.

In April 1966 the Commissioner issued an interim policy to provide for controlled erection of advertising structures until final standards were promulgated by the Board in agreement with the Secretary of Commerce. It provided for permits to be issued under certain circumstances "for a term extending to January 1, 1970, unless sooner invalidated by agreement between the State Highway Commissioner and the Secretary of Commerce or by standards adopted by the Secretary of Commerce, at which time the sign must be removed by the permittee unless extended by the State Highway Commission. The permittee must agree to save the State harmless from any costs or liabilities arising from the removal of the sign and cancellation of the lease between sign owner and landowner."

The North Dakota Legislature enacted the North Dakota Act, with an emergency clause which made it effective February 28, 1967. The Act was codified as Chapter 24–17, N.D.C.C.

Section 1 of the Act [24–17–01, N.D.C.C.] declared a public policy to regulate, but not prohibit, outdoor advertising

"through zoning principles and standards consistent with the public policy relating to the areas adjacent to the state highway system pursuant to title 23, United States Code, section 131 and section 319 and rules and regulations promulgated thereunder."

Section 24–17–03, N.D.C.C., provided:

"Subject to the provisions of this Act, no sign shall, after January 1, 1968, be erected or maintained within six hundred and sixty feet from the nearest edge of the right-of-way and visible from the main traveled way of any highway which is a part of the state highway system in this state except the following:

"1. . . .

"2. . . .

"3. . . .

"4. Signs in areas which are now or hereafter zoned industrial, commercial, or the like by the board as provided in this Act.

"5. Signs in unzoned commercial or industrial areas, which now or hereaf-

ter qualify as such, pursuant to the agreement between the board and the secretary of transportation according to title 23, United States Code, section 131.

"6. . . .

"7. . . .

"8. . . . "

Section 24–17–04, N.D.C.C., contained provisions for removal of signs.

Compensation was provided for removal of certain signs in Section 24–17–05, N.D.C.C., which will be discussed later in this opinion.

The North Dakota State Highway Corridor Board was created as an agency of the State and was composed of five members, one of whom was a representative of the North Dakota Outdoor Advertising Association. The first such representative was Harold Newman, the president of Newman Signs, Inc. The duties and powers of the Board were set forth in Section 24–17–09, N.D.C.C., and, where relevant, will be discussed later in this opinion.

Section 24–17–11, N.D.C.C., declares illegal any signs which violate Chapter 24–17 or the Corridor Board's regulations, provides for notice to the owner to remove prohibited signs, and provides that the Commissioner may remove such signs if the owner fails to act or if the sign is abandoned.

Section 24–17–15, N.D.C.C., sets forth the manner in which one aggrieved by a decision of the Board may appeal. Appeals from such decisions are to the district court and Supreme Court in accordance with Sections 28–32–15 through 28–32–21 (which are the parts of the North Dakota Administrative Agencies Practice Act relating to appeals), but no other sections of Chapter 28–32 apply to the proceedings of the Board.

The Highway Corridor Board met and adopted an interim policy covering outdoor advertising which was similar to the policy of the Highway Commissioner. Newman voted against the interim policy. The language in the Board's permit stated, in capital letters:

"UNDER NO CIRCUMSTANCES WILL THE PERMITTEE BE PAID JUST COMPENSATION FOR THE REMOVAL, CHANGING, ALTERING OR MODIFICATION OF ANY SIGN, DEVICE OR DISPLAY ERECTED BY VIRTUE OF THIS PERMIT AND THE PERMITTEE EXPRESSLY WAIVES HIS RIGHTS, IF ANY, TO SUCH COMPENSATION."

Newman protested the waiver language contained in the permit during the Highway Corridor Board's meetings, without success. In order to maintain his business he complied with the permit procedure, but filed written protests along with some of his applications for permits.

The Board's interim policy was submitted to the Attorney General for approval as to legality, which was given. On December 8, 1967, the Board published notice of a public hearing on its rules and regulations for placement of outdoor advertising signs. The Board held one hearing on proposed rules and regulations on January 24, 1968.

On July 1, 1969, an amendment to Section 24–17–03, N.D.C.C., became effective. It provided:

"Subject to the provisions of this chapter, no sign shall, after January 1, 1968, *or any later date established by the Congress of the United States in relation to title 23, United States Code, section 131, or waiver thereof pursuant to said title 23,* be erected or maintained within six hundred and sixty feet . . . ." [Underlined portion indicates new language.]

On January 6, 1972, the Commissioner was informed by the Secretary of Transportation that the State of North Dakota must execute an agreement with the Secretary of Transportation by January 20, 1972, or it would not be in compliance with the Federal Act and therefore would be penalized by not receiving 10 percent of its Federal aid. An agreement between the State of North Dakota and the Secretary of Transportation was executed, effective as of January 19, 1972.

The North Dakota Highway Corridor Board met on August 1, 1973, and adopted with some amendments the regulations which had previously been published and noticed for hearing on January 24, 1968.

In early 1975, 23 U.S.C. § 131 was amended to provide in subsection (g) that "Just compensation shall be paid upon the removal of any outdoor advertising sign, display, or device lawfully erected under State law."

During 1972, the Highway Department began removing nonconforming signs erected prior to December 3, 1965, and did not provide compensation for those signs erected thereafter without permits or under the interim policy. Newman objected to the removal of its signs without just compensation, and this action followed.

The issues raised by the parties, as restated by us are:

1. When did the legal prohibition against erection of nonconforming outdoor advertising signs become effective—December 3, 1965 (date of first rules and regulations issued by the Commissioner); January 1, 1968 (date specified in the North Dakota Highway Beautification Act); January 19, 1972 (date agreement between North Dakota and the Secretary of Transportation was executed); or August 1, 1973 (date Board formally issued rules and regulations)?

2. Whether signs erected after December 3, 1965, pursuant to the Commissioner's and the Board's interim policies requiring a permit containing provisions for removal of signs without compensation, were lawfully erected under State law, requiring just compensation for damages upon removal.

3. Whether Newman, as a member of the Board during the period in controversy, is estopped from relying upon inaction of the Board in promulgating rules and regulations.

4. Whether Newman is entitled to compensation for damages resulting from the removal of signs which existed prior to the effective date of the Act which were expanded, reconstructed, or substantially altered later.

5. Whether signs erected without a permit upon property, the advertising rights on which had been previously purchased by the Highway Department, are signs lawfully erected under State law, requiring just compensation upon removal.

6. Whether Chapter 24–17, N.D.C.C., is unconstitutional because it—

a. permits the taking of private property for public use without payment of just compensation, or

b. creates an unconstitutional classification, or

c. violates due process of law, contrary to Section 13 of the Constitution of North Dakota and the Fourteenth Amendment of the Constitution of the United States, or

d. violates the First Amendment guarantee of freedom of speech, or

e. contains an unconstitutional delegation of power to legislate to a Federal administrator.

## DECISION

*Issue 1: Effective date of prohibitory and regulatory provisions of the 1967 North Dakota legislation*

The Act was passed by the 1967 Legislature with an emergency clause, making it effective upon the signature of the Governor on February 28, 1967. (Chapter 291, 1967 Session Laws, codified as Chapter 24–17, N.D.C.C.)

Section 3 [24–17–03, N.D.C.C.] provided, prior to the 1969 amendment referred to below:

"Subject to the provisions of this Act, no sign shall, after January 1, 1968, be erected or maintained within six hundred and sixty feet from the nearest edge of the right-of-way and visible from the main traveled way of any highway which is a part of the state highway system in this state except [certain enumerated exceptions]."

We are satisfied that the meaning of Section 3 [24–17–03, N.D.C.C.] as originally adopted is that no outdoor advertising sign, aside from those specifically excepted by

the terms of Section 3, could lawfully be erected or maintained after January 1, 1968. Any advertising signs erected or maintained in violation of that prohibition were illegal and subject to removal without payment of just compensation.[3] Signs erected prior to January 1, 1968, in conformity with prior law would be considered lawfully erected, and, if conforming to the new statute, could continue to exist. If not in conformity with the new statute, they would be permitted to exist for five years or until July 1, 1970, whichever came later. If acquired by the Commissioner pursuant to Section 5 [24–17–05, N.D.C.C.],[4] just compensation must be paid.

For several years after the passage of the Federal Act, the Congress appropriated only small sums of money to put it into effect. The Secretary of Commerce, and later the Secretary of Transportation, to whom enforcement of the Act was transferred, chose to suspend the provisions of 23 U.S.C. § 131(b) as to reducing highway funds to the States by 10 percent if they were not exercising effective control of outdoor advertising.

In 1969, the North Dakota Legislature amended 24–17–03 by adding the language underlined below, so that the section reads:

"Subject to the provisions of this chapter, no sign shall, after January 1, 1968, *or any later date established by the Congress of the United States in relation to title 23, United States Code, section 131, or waiver thereof pursuant to said title 23,* be erected or maintained within six hundred and sixty feet from the nearest edge of the right-of-way and visible from the main-traveled way of any highway which is a part of the state highway system in this state except the following: [enumerated exceptions]."

Newman argues that this amendment, when read with the Federal Act and the waiver of penalty to be imposed upon States not exercising effective control, means that the prohibition against erecting and maintaining outdoor advertising after January 1, 1968, was postponed until such later date as the State was found to be exercising effective control, or such later date as the Board adopted rules and regulations. Apparently the district court agreed in part with this argument, since it held that the Act became effective on January 19, 1972, when the Commissioner signed an agreement with the Secretary of Transportation defining "unzoned industrial and commercial areas" and defining the size, lighting, and shape of conforming signs. The adoption of rules and regulations by the Board came on August 1, 1973, and that is the date which Newman claims to be the effective date.

We have carefully examined all the language and history cited to us by the parties, and we cannot find that the subsequent legislation or the acts of the State or Federal authorities changed the effective date of the prohibitions of the North Dakota Act from January 1, 1968, the date specified in the Acts and never modified. The addition of the language as to a "later date established by the Congress . . . or waiver thereof" did not change the date of January 1, 1968, contained in the North Dakota Act. The same date also continued to be specified in the Federal Act. It was never amended out of the Federal Act, nor was it waived. All that was waived by the Federal Government was the 10 percent penalty provision of 23 U.S.C. § 131(b). The date of January 1, 1968, remained in the Federal Act, not only in 131(b), but in several other places as well. There was no "later date established by the Congress . . . or waiver thereof."

As was said in a very similar case decided by the Court of Appeals of Louisiana, *State, Dept. of Hwys. v. Lamar Adv. Co. of La., Inc.,* 304 So.2d 779, 784 (La.App.1974),

"In the present case, if the Legislature had not intended the statute to become effective until the Highway Department issued further regulations or until the compliance agreement was entered into,

---

**3.** The constitutionality of this provision is discussed later in the opinion.

**4.** This section was amended in 1975 and the amendment was not discussed by the parties.

it would have been very simple for the Legislature to state this in the statute. The courts should not imply that the Legislature intended a special effective date unless such implication is so clear as to admit of no other reasonable interpretation."

We hold that the prohibitory and regulatory provisions of the 1967 North Dakota legislation became effective January 1, 1968, the date specified in the Act.

*Issue 2: Whether signs erected after December 3, 1965, pursuant to the Commissioner's and the Board's interim policies requiring a permit containing provisions for removal of signs without compensation, were lawfully erected under State law, requiring just compensation for damages upon removal*

After the passage of the Federal Act, the Highway Commissioner moved rapidly to impose limitations upon outdoor advertising. His reasons are not fully stated in the record, but perhaps he was concerned over the ultimate cost of removal of signs which might be lawfully erected before the effective date of the Federal Act. At any rate, he took action to restrict the construction of new outdoor advertising signs which might be erected along interstate highways. He first obtained an opinion of the Attorney General that he had the authority to issue rules on the subject, and he then promulgated "Rule and Regulation Governing Control of Billboard Advertising Along Interstate and Primary Highways," dated December 2, 1965, and filed in the office of the Attorney General on December 3, 1965. The rule became effective on the latter date, pursuant to Section 28–32–03, N.D.C.C., a part of the Administrative Agencies Practice Act, Chapter 28–32, N.D.C.C. The Commissioner's rule provided:

"The establishment of billboard advertising along interstate and primary highways in the State of North Dakota shall be prohibited within 660 feet from the nearest edge of the right of way unless permission to so establish billboard advertising within 660 feet from the nearest

edge of the right of way along interstate and primary highways is requested in writing and the permission requested is granted in writing by the North Dakota State Highway Commissioner."

Section 28–32–03, N.D.C.C., provides that rules and regulations promulgated and adopted by an administrative agency, when filed with the Attorney General, "shall have the force and effect of law until amended or repealed by the agency or until the same is declared invalid by a final court decision." Thus there is a presumption of validity of a rule or regulation of an administrative agency, comparable to the presumption of validity of a statute.

Any person adversely affected by the Commissioner's rule could have petitioned for reconsideration under Section 28–32–04, N.D.C.C.

Newman did not seek a rehearing, nor did it bring any proceeding by way of appeal or declaratory judgment or otherwise. Instead, it made application for permits to the Commissioner, and accepted the benefits of such permits by constructing signs. By so doing, it estopped itself from attacking the constitutionality of the rule and regulation of the Commissioner. We have held repeatedly that one who seeks and obtains the advantage of a statute is estopped from challenging the constitutionality of that statute. The rule goes back at least to 1893, where we said in *Minneapolis, St. P. & S. Ste. M. Ry. Co. v. Nester*, 3 N.D. 480, 483, 57 N.W. 510, 512 (1893):

"He went before the commissioners, and sought the benefit of this law. Subsequently, he voluntarily chose to pursue a remedy provided by the statute in preference to a common-law remedy that was open to him. By these acts he has waived any benefit of the constitutional provision. Such should be the law in reason, and such is the law upon authority. Cooley, Const. Lim. 216; End.Interp.St. § 537, and cases there cited."

In *State v. Mundy*, 53 N.D. 249, 255, 205 N.W. 684, 686 (1925), we said:

"Both on principle and authority one who voluntarily enters into an engagement for the purpose of enjoying certain benefits and advantages and by virtue thereof reaps these advantages is precluded from denying the validity of his engagement or undertaking."

In *Cofman v. Ousterhous*, 40 N.D. 390, 402, 168 N.W. 826, 829, 18 A.L.R. 219 (1918), we said:

"It is clear, indeed, that a person who obtains a license under a law, and seeks for a time to enjoy the benefits thereof, cannot afterwards question the constitutionality of the act when the license is sought to be revoked."

And see *Ethen v. North Dakota Workmen's Compensation Bureau*, 62 N.D. 394, 244 N.W. 32 (1932).

We therefore hold that the construction of signs within the terms of the Commissioner's rule during the period in question was subject to that rule and to the terms of permits issued under that rule.

■ If a permit issued by the Commissioner during the period in question contains an undertaking to waive any right to compensation upon removal of the sign, such a provision would be valid and binding. If no such waiver is contained in the permit, the sign constructed under the permit would be "lawfully erected" under State law and the owner of the sign would be entitled to compensation upon removal to the extent permitted by the subsequent legislation, to be discussed later in this opinion.

On April 28, 1966, the Commissioner issued an "interim policy" which allowed the erection of new signs under certain circumstances after obtaining a permit. The policy included this language:

"The permittee must agree to save the State harmless from any costs or liabilities arising from the removal of the sign and cancellation of the lease between sign owner and the land owner."

It provided that permits would be granted for a term extending to January 1, 1970, unless sooner invalidated by agreement between the Commissioner and the Secretary or by standards adopted by the Secretary, at which time the sign must be removed by the permittee unless extended by the Commissioner.

It also provided that the location of signs within municipalities was to be in accordance with city zoning regulations, and outside municipal limits, the size, spacing, and location of signs would be in accordance with a proposal submitted by the Outdoor Advertising Association of North Dakota at a hearing held on March 1, 1966.

Permits issued under this policy stated, in capital letters:

"UNDER NO CIRCUMSTANCES WILL THE PERMITTEE BE PAID JUST COMPENSATION FOR THE REMOVAL, CHANGING, ALTERING OR MODIFICATION OF ANY SIGN, DEVICE OR DISPLAY ERECTED BY VIRTUE OF THIS PERMIT AND THE PERMITTEE EXPRESSLY WAIVERS [*sic*] HIS RIGHTS, IF ANY, TO SUCH REDRESS."

■ This policy was not submitted to the Attorney General for approval. However, we hold that it is within the terms of the prior rule of December 3, 1965, which was approved by the Attorney General, which required a written request for permission to construct outdoor advertising signs and written permission from the Commissioner to do so. The authority to impose terms in giving a permit is necessarily implied from the right to grant the permit.

On February 28, 1967, the North Dakota Highway Beautification Act was signed by the Governor and the Highway Corridor Board was created. Section 24–17–09 provides that the Board "shall enact suitable regulations to carry out the purposes" of the statute. The regulations are to be made in accordance with a comprehensive plan and design for several purposes, including the placement of signs within 660 feet of the right-of-way and adoption of standards relating to size, lighting, and spacing, the issuance of permits for signs within 660 feet of the right-of-way and visible from the highway, the establishment of fee schedules for permits and prescribing

of regulations for issuance thereof by the Commissioner, and determination of un-zoned commercial or industrial areas by agreement between the Board and the Secretary pursuant to 23 U.S.C. § 131.

■ The first action by the Board was the adoption of an interim policy on March 21, 1967. This was reasonably expeditious action. During the short interval between the adoption of the North Dakota Act and the adoption of the interim policy by the Board, the language of the Commissioner's interim policy governed, except to the extent, if any, that it was inconsistent with the Act.

The Board's interim policy adopted a so-called "ring" theory advocated by the billboard industry. It allowed signs near cities, the distance from each city varying according to the size of the city, from one-half mile for cities with less than 100 population to three miles for cities over 10,000 population. It provided for size limitations and spacing requirements. The policy also provided:

"The permittee must agree to save the state harmless from any costs or liabilities arising from the removal of the sign and cancellation of the lease between sign owner and landowner."

Newman applied for and received a substantial number of permits under this policy. Beginning in 1971, its applications for permits were accompanied by written protests as to the limitations of the policy. The protests were rejected.

The Board's interim policy was submitted to the Attorney General for approval under the Administrative Agencies Practice Act, *supra*, and the approval was given on April 6, 1967.

■ Apparently all parties concerned were unaware of the fact that the North Dakota Highway Beautification Act contains a specific provision making the Administrative Agencies Practice Act inapplicable, except as to appeals, to proceedings under the Highway Beautification Act. The nullification of the other aspects of the Administrative Agencies Practice Act is hidden under the heading "Appeals to district court" of Section 24–17–15, which reads:

"Any person, or persons, jointly and severally, aggrieved by a decision of the board under this chapter, may appeal therefrom to the district court and to the supreme court in accordance with sections 28–32–15 through 28–32–21, *provided, however, that no other sections in chapter 28–32 shall be applicable to any proceedings of the board.*" [Emphasis added.]

The effect of the italicized portion, of course, is to make the Administrative Agencies Practice Act inapplicable to the Highway Beautification Act, except as to appeals. Not surprisingly, this provision was overlooked in the application of the Highway Beautification Act.

■ The Act contains its own (somewhat inconsistent) provisions for the adoption of rules and regulations. In Section 24–17–10 it provides that rules and regulations "shall be filed with the commissioner and shall have the force and effect of law upon such filing." But later in the Act, in Section 24–17–13, it provides that the Board "may" propose rules or regulations for promulgation and "shall" hold public hearings thereon. Such proposed rules or regulations "shall" be published in the official county newspaper of each county in which land may be affected by the rule or regulation. Section 24–17–14 then provides that the Board "may adopt" the proposed rules or regulations with such changes as it deems advisable. Upon adoption of the rule or regulation, the Board "shall" cause it to be published for three weeks in the official newspaper of each affected county, and proof of publication "shall" be filed in the office of the county auditor and with the Highway Commissioner, and "thereupon the resolutions, rules or regulations shall take effect." The conflict between rules and regulations which may be adopted without notice and are effective upon filing with the Commissioner, and rules and regulations which are adopted only after hearing and publication and filing with the Commissioner and the county auditor, is

apparent. Since the provisions are in hopeless conflict, we hold that the more specific [Sections 24–17–13 and 24–17–14] govern the more general [Section 24–17–10].

■ In any case, the internal requirements of the statute were not complied with, no doubt because of the assumption that the Administrative Agencies Practice Act governed. The result of the failure to follow the internal requirements of the Highway Beautification Act is that the rules and regulations were not properly adopted.

The Board had a hearing on rules and regulations on January 24, 1968, but no rules and regulations were adopted by the Board until August 1, 1973, and the rules adopted then were written so as to conform to an agreement between the Board and the Secretary of Transportation on January 19, 1972.

However, Newman is in no position to raise the question of the validity of the regulations because it sought and accepted the benefits of the permit system which it now attacks. This it cannot do, for reasons stated previously in this opinion. So far as it is concerned, the rules and regulations were binding.

*Issue 3: Whether Newman, whose president was a member of the Board during the period in controversy, is estopped from relying upon inaction of the Board in promulgating rules and regulations*

The district court, in its memorandum opinion, concluded that "If there was unreasonable lapse of time, or the Board was otherwise remiss in failing to adopt regulations, Mr. Newman, as a Board member, must share that responsibility" and therefore Newman is "estopped from asserting a right to just compensation for nonconforming signs erected after January 19, 1972." In light of our holding above, that Newman waived its right to question the validity of the Board's regulations and is bound by them due to its acceptance of benefits thereunder, it is unnecessary for us to determine this issue.

*Issue 4: Whether Newman is entitled to compensation for damages resulting from the removal of signs which existed prior to the effective date of the Act which were expanded, reconstructed, or substantially altered later*

The district court made no ruling regarding this issue, presumably because it found the effective date of the Act to be January 19, 1972, and considered signs which had been expanded, reconstructed, or substantially altered prior to that date as being legally erected.

■ Under Section 24–17–05, Newman is entitled to compensation for damages resulting from the removal of signs which were lawfully erected but became nonconforming due to the passage of the Act or the promulgation of regulations thereunder. Section 24–17–04 provides sign owners a five-year amortization period during which a nonconforming sign is allowed to remain even though not in compliance with the Act or regulations. The question is whether compensation must be paid to a sign owner who expands, reconstructs, or substantially alters a nonconforming sign during this five-year period.

Section 24–17–05 directed the Commissioner—

". . . to acquire by purchase, gift, condemnation or exchange, signs lawfully erected which do not conform to this Act or the regulations established by the board. Owners of advertising structures, signs, displays or devices acquired by the commissioner pursuant to this section, and the owners of the land upon which such displays are located shall be paid just compensation for the *reasonable damages, if any,* suffered by the reason of such removal before the end of the fifth year after such displays become nonconforming.

"Despite any contrary provision of this Act, no sign shall be required to be removed unless at the time of removal there are sufficient funds, from whatever source, appropriated and available to this

state with which to pay the just compensation required under this section, and unless at such time the federal funds allotted to this state under title 23, United States Code, section 131 or section 319 have been appropriated and are available to this state; provided, however, that signs erected after October 22, 1965, and prior to December 3, 1965, which are required to be removed to be in conformity with title 23, United States Code, section 131 of the rules and regulations promulgated thereunder the commissioner may acquire such signs in the manner provided herein and expend state highway funds for their acquisition." [Emphasis added.]

The Corridor Board has the power—

"b. To regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings and structures; . . ." Sec. 24–17–09, subsec. 2, N.D.C.C.

Owners of signs subject to the terms of the Board's Outdoor Advertising Permit waived any right to compensation "FOR THE REMOVAL, CHANGING, ALTERING OR MODIFICATION OF ANY SIGN, DEVICE OR DISPLAY ERECTED BY VIRTUE OF" the permit.

█ Inclusion of a five-year amortization period within the statutory scheme indicates that the Legislature intended to allow the sign owner to recoup at least part of his investment in the sign prior to requiring its removal while at the same time reducing the compensation due from the State upon removal of the sign.

█ Expansion or enlargement of nonconforming uses generally is not allowed. The Michigan Court of Appeals, in *White Lake Township v. Lustig*, 10 Mich.App. 665, 674, 160 N.W.2d 353, 357 (1968), stated: ". . . it is the law of Michigan that the continuation of a nonconforming use must be substantially of the same size and same essential nature as the use existing at the time of passage of a valid zoning ordinance."

See also *Dearden v. City of Detroit*, 70 Mich.App. 163, 169, 245 N.W.2d 700, 703 (1976).

The Iowa Supreme Court is in accord: ". . . plaintiff argued this construction is not an enlargement or extension because it does not add to the life of the building. It is true the effect on longevity of a nonconforming building is sometimes material in determining whether a work is a permissible repair or an impermissible extension. [Citation.] But plaintiff is wrong in suggesting there can be no extension or enlargement of the use unless the longevity of the building is increased. Other factors can increase the use." *Stan Moore Motors, Inc. v. Polk County Bd. of Adjust.*, 209 N.W.2d 50, 52 (Iowa 1973).

To allow more than basic repair and maintenance of a nonconforming sign would defeat the purpose of the statute. And to construe the statute so as to require the State to compensate a sign owner according to the value of the sign after it has been expanded, reconstructed, or substantially altered would not constitute the payment of "reasonable damages."

Because the district court did not deal with this issue, it is necessary to remand the case for a determination of which signs were expanded, reconstructed, substantially altered, or abandoned in such manner as to limit compensation upon removal to the value of the sign before it had been expanded, reconstructed, or substantially altered or to eliminate the requirement of payment of compensation upon removal in the case of abandoned signs.

*Issue 5: Whether signs erected without a permit upon property, the advertising rights on which had been previously purchased by the Highway Department, are signs lawfully erected under State law, requiring just compensation upon removal*

█ The Commissioner argues that the Highway Department, prior to 1965, had purchased advertising rights under various State statutes where Federal fund incen-

tives were provided to States making such acquisitions. Newman's argument is premised, in part, on the contention that the effective date of statutory control of outdoor advertising in North Dakota was January 19, 1972. In addition, Newman argues that the Board, pursuant to Section 24–17–09, subsection 3, determined that the advertising rights previously acquired by the Highway Department were not necessary. Section 24–17–09, subsection 3, states:

"3. The board shall review all rights now acquired by the state of North Dakota for the use and benefit of the state highway department pertaining to the right and control over the erection, location or maintenance of billboards, signs or any form of advertising within six hundred and sixty feet [201.17 meters] from the nearest edge of the right of way of the state highway system, and should the board determine that such rights previously acquired are not necessary to accomplish the purpose of this chapter then such rights shall be vacated pursuant to section 24–01–28."

The district court did not deal with this issue.

It is clear that if the Highway Department properly acquired advertising rights which legally precluded the landowner from leasing advertising rights to Newman, and the Highway Department's advertising rights were not "vacated" by the Board pursuant to Section 24–17–09, subsection 3, then signs erected by Newman upon such property were not lawfully erected and Newman is not entitled to compensation. If, however, the advertising rights acquired by the Highway Department were not such as to legally preclude the landowner from entering into a lease agreement with Newman for advertising rights or if the Board properly "vacated" the advertising rights held by the Highway Department prior to the erection of the sign, then the sign would be lawfully erected and subject to the payment of just compensation upon removal.

We find it necessary to remand this issue to the district court for disposition consistent with this opinion.

*Issue 6–a: Whether Chapter 24–17, N.D. C.C., is unconstitutional because it permits the taking of private property for public use without payment of just compensation*

The characterization of the State's action as a noncompensable regulation under the police power as opposed to a compensable taking under the power of eminent domain is not susceptible to any easy formulation, but, rather, often turns on differences of degree. *Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). Both involve some curtailment of private property rights.

In the past, payment of just compensation for a "taking" was required only when there was an actual physical taking or when the Government asserted a proprietary interest for itself in the owner's property. *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887). More recently, the term "taking" has been held to include restrictions on the use of property which deprive the owner of all or substantially all of the beneficial use of his property. *Penna. Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

As the United States Supreme Court has said, ". . . the mere fact that the regulation deprives the property owner of the most profitable use of his property is not necessarily enough to establish the owner's right to compensation." *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228, 1236 (1958). However, ". . . the form of regulation [can] be so onerous as to constitute a taking which constitutionally requires compensation." *Goldblatt v. Hempstead, supra,* 369 U.S. at 594, 82 S.Ct. at 990, 8 L.Ed.2d at 133.

It has generally been held that a reasonable restriction of the use of property

pursuant to a State's police power does not constitute a taking of private property for public use requiring payment of just compensation so long as the regulation is reasonably related to a proper purpose and does not unreasonably deprive the property owner of all or substantially all beneficial use of his property. *Modjeska Sign Studios, Inc. v. Berle*, 43 N.Y.2d 468, 402 N.Y. S.2d 359, 373 N.E.2d 255 (C.A.N.Y.1977); *Eldridge v. City of Palo Alto*, 57 Cal.App.3d 613, 129 Cal.Rptr. 575 (1976).

The question, therefore, is whether Chapter 24–17 is reasonably related to a proper purpose under the State's police power; and, if so, does it nevertheless deprive the owner of all or substantially all of the beneficial use of his property, thus requiring payment of just compensation?

Newman argues that Chapter 24–17, N.D.C.C., is an unconstitutional exercise of the police power, in that the Legislature acted unreasonably, arbitrarily, and without a proper purpose. It is a well-established rule of law that an enactment of the Legislature is presumed to be valid, and the presumption is conclusive unless clearly shown to be in contravention of the State or Federal Constitution. *Southern Valley Grain Dealers Assn. v. Board of County Commissioners of Richland County*, 257 N.W.2d 425 (N.D.1977); *Gableman v. Hjelle*, 224 N.W.2d 379 (N.D.1974); *Horst v. Guy*, 219 N.W.2d 153 (N.D.1974). Newman therefore has the burden of coming forward with evidence showing why the enactment is constitutionally defective.

The test for determining whether a legislative enactment constitutes an invalid exercise of the police power is stated in *Soderfelt v. City of Drayton*, 79 N.D. 742, 752, 59 N.W.2d 502, 507 (1953):

"Statutory enactments and municipal ordinances having for their purpose the protection of the public health, safety, morals and public welfare are founded upon the police power inherent in the state. In passing upon the constitutionality of such statutes or ordinances the courts will not declare them unconstitutional and thus substitute their judgment for that of the legislative body charged with the primary duty and responsibility of determining the question where the question is fairly debatable, that is, unless the statute or ordinances are clearly arbitrary and unreasonable having no substantial relation to the public health, safety, morals or public welfare."

See also *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

Newman argues that the purpose of the chapter was to avoid the penalty imposed by the Federal law in the event North Dakota did not comply, and that such a purpose is an arbitrary reason for enacting such a law. He argues that the Legislature did not declare a nuisance, did not find any evidence, and did not declare any safety or aesthetic reasons for enacting the law, but instead merely declared that the public interest was at stake.

The preamble to the Act explains the purpose of the enactment as follows:

"Declaring public policy with regard to the regulation of outdoor advertising and the restoration, preservation and enhancement of scenic beauty; . . ." 1967 S.L., Chap. 291.

The declaration of policy contained in Section 24–17–01, N.D.C.C., states that it is ". . . in the public interest reasonably to regulate advertising devices along the highways hereinafter specified while, at the same time, recognizing that both the convenience of travel and the interests of the economy as a whole require a reasonable freedom to advertise. . . . It is further declared to be in the public interest to review all rights now acquired by the state of North Dakota for the use and benefit of the state highway department pertaining to the right and control over the erection, location or maintenance of billboards, signs or any form of advertising adjacent to the state highway system, to determine and designate such areas adjacent to the state highway system as are necessary for the restoration, preservation and enhancement of scenic beauty . . ."

In addition, Section 24–17–09, N.D.C.C., which sets forth the duties and powers of the Board, specifies that the Board's function includes establishing zoning districts and issuing regulations:

"1. For the purpose of promoting the public health, safety, welfare, convenience, enjoyment and recreational value of the public highways, to protect the public investment in the state highway system and to preserve the natural beauty of lands bordering on the state highway system, . . . ."

Thus the Legislature has clearly identified the purposes it intended to achieve by adopting Chapter 24–17, which include restoring, enhancing, and preserving scenic beauty along the Interstate and primary highway systems of the State; promoting the safety and convenience of those traveling on the highways; protecting the public investment in the State highway system; and promoting the enjoyment and recreational value of the State highways. We conclude that these purposes are within the proper scope of the police power of a State. Many courts which have decided cases arising under similar statutes are in agreement. See, e. g., *Inhabitants, Town of Boothbay v. National Adv. Co.*, 347 A.2d 419 (Me.1975); *Markham Advertising Company v. State*, 73 Wash.2d 405, 439 P.2d 248 (1968), *appeal dismissed* 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 512 (1969); *Cromwell v. Ferrier*, 19 N.Y.2d 263, 279 N.Y.S.2d 22, 225 N.E.2d 749 (1967).

Courts which have dealt with the regulation of outdoor advertising signs have often quoted the language of *Berman v. Parker*, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27, 38 (1954), as support for the inclusion of such regulation within the concept of the public welfare:

"The concept of the public welfare is broad and inclusive. . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled."

Some courts have recognized that aesthetic considerations alone may form the basis for a valid exercise of the police power. See *State v. Diamond Motors, Inc.*, 50 Haw. 33, 429 P.2d 825 (1967); *Oregon City v. Hartke*, 240 Or. 35, 400 P.2d 255 (1965); *Jasper v. Commonwealth*, 375 S.W.2d 709 (Ky.1964); *People v. Stover*, 12 N.Y.2d 462, 240 N.Y.S.2d 734, 191 N.E.2d 272 (1963); *Westfield Motor Sales Co. v. Town of Westfield*, 129 N.J.Super. 528, 324 A.2d 113 (1974). We need not decide whether aesthetic considerations alone justify this regulation because the regulation is based upon a combination of purposes which we find to be within the police power.

In addition to preserving scenic beauty, the Legislature also recognized safety as a purpose of the chapter. Although some courts have questioned the validity of the assertion that outdoor advertising signs have a detrimental effect on traffic safety, we have been provided with no evidence to indicate that such a relationship does not exist. We agree with the statement of the New York appellate court in *Whitmier & Ferris Company v. State*, 20 N.Y.2d 413, 284 N.Y.S.2d 313, 315, 230 N.E.2d 904, 905 (1967):

"If people did not look at the signs, advertisers would not find it profitable to put them there. It was within the competence of the Legislature to determine that the safety of the traveling public is endangered by this distraction of the attention of drivers of automobiles under these circumstances. Exercise of the police power over subjects whose relationship to the public safety is honestly debatable cannot be held unconstitutional by the courts [Citation]."

We also conclude that Chapter 24–17, N.D.C.C., does not deprive Newman of all or substantially all of the beneficial use of its property.

The Act does provide compensation for lawfully erected signs which, due to the enactment of the statute or the regulations thereunder, become nonconforming. Sec. 27–17–05, N.D.C.C. The North Dakota Act

also provides within its statutory scheme an amortization period during which a sign owner is allowed to maintain his sign without its being subject to removal. This type of provision is common in many States and has been upheld against constitutional attack. See, e. g., *E. B. Elliott Adv. Co. v. Metropolitan Dade County*, 425 F.2d 1141 (5th Cir. 1970); *National Advertising Co. v. County of Monterey*, 1 Cal.3d 875, 83 Cal. Rptr. 577, 464 P.2d 33 (1970), *appeal dismissed* 398 U.S. 946, 90 S.Ct. 1869, 26 L.Ed.2d 286 (1970); *Webster Outdoor Advertising Co. v. City of Miami*, 256 So.2d 556 (Fla.App.1972); *Art Neon Co. v. City and County of Denver*, 488 F.2d 118 (10th Cir. 1973), *cert. denied* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *Donnelly Advertising Corp. v. City of Baltimore*, 279 Md. 660, 370 A.2d 1127 (1977); *Naegle Outdoor Adv. Co. v. Village of Minnetonka*, 281 Minn. 492, 162 N.W.2d 206 (1968).

Amortization has been found to be a constitutionally acceptable way of compromising the competing interests of private property owners and the public. "Use of a reasonable amortization scheme provides an equitable means of reconciliation of the conflicting interests in satisfaction of due process requirements." *City of Los Angeles v. Gage*, 127 Cal.App.2d 442, 460, 274 P.2d 34, 44 (1954).

Newman argues that it is being deprived of the right to engage in a lawful business; however, it is well settled that even a legitimate business may be regulated in the public interest. *Johnson v. Elkin*, 263 N.W.2d 123 (N.D.1978); *Breard v. Alexandria*, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951).

The chapter does nothing more than regulate one particular future use of property while leaving available to the property owner all other uses. Newman continues to have available the option of erecting and maintaining signs within the confines of the statute. We cannot say, based on the record before us, that the negative restriction placed upon the landowner and thus on his lessee has the effect of depriving Newman of all or substantially all of the beneficial use of his property.

*Issue 6–b: Whether Chapter 24–17, N.D. C.C., is unconstitutional because it creates an unconstitutional classification*

Newman contends that the chapter unconstitutionally discriminates between off-premise and on-premise signs. In challenging the constitutionality of a statute on this basis, Newman must bear the burden of establishing that the classification bears no reasonable relation to a conceivable legislative purpose. *Snyder's Drug Stores, Inc. v. North Dakota State Board of Pharmacy*, 219 N.W.2d 140 (N.D. 1974).

This court, in *Signal Oil and Gas Co. v. Williams County*, 206 N.W.2d 75, 83 (N.D. 1973), recognized that the Legislature has broad discretion in making classifications, and enunciated the test to be applied in determining whether a particular classification is unconstitutional:

"It is . . . well established that a classification although discriminatory is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it. [Citations omitted.] Furthermore, a court need not know the special reasons, motives, or policies of a State legislature in adopting a particular classification, so long as the policy is one within the power of the legislature to pursue, and so long as the classification bears a reasonable relation to those reasons, motives, or policies."

Several courts have had occasion to decide this precise issue and have upheld the differential treatment of on-premise and off-premise advertising signs. In an opinion written by Mr. Justice William Brennan (now of the United States Supreme Court), the New Jersey Supreme Court reasoned:

"The business sign is in actuality a part of the business itself, just as the structure housing the business is a part of it, and the authority to conduct the business in a district carries with it the right to maintain a business sign on the premises subject to reasonable regulation in that

regard . . . Plaintiff's placements of its advertising signs, on the other hand, are made pursuant to the conduct of the business of outdoor advertising itself, and in effect what the ordinance provides is that this business shall not to that extent be allowed in the borough. It has long been settled that the unique nature of outdoor advertising and the nuisances fostered by billboards and similar outdoor structures located by persons in the business of outdoor advertising, justify the separate classification of such structures for the purposes of governmental regulation and restriction." *United Advertising Corp. v. Borough of Raritan,* 11 N.J. 144, 150, 93 A.2d 362, 365 (1952).

The United States Supreme Court also has given the distinction its approval in dictum found in *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). It dismissed an appeal in *Markham Advertising Co. v. State, supra,* 73 Wash.2d 405, 439 P.2d 248 (1968), 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 512 (1969), for want of a substantial Federal question. See also *Inhabitants, Town of Boothbay v. National Adv. Co., supra,* and *Landau Advertising Co. v. Zoning Board of Adjustment,* 387 Pa. 552, 128 A.2d 559 (1957).

The above cases recognize that on-premise signs serve the special purpose of identifying the services or products found at the particular site and are a necessary part of conducting a business. On-premise signs are subject to reasonable regulation; however, they need not be regulated to the same extent or in the same manner as off-premise signs. We find that it is not arbitrary or unreasonable to provide different regulations for off-premise and on-premise signs.

*Issue 6–c: Whether Chapter 24–17, N.D. C.C., is unconstitutional because it violates due process of law, contrary to Section 13 of the Constitution of North Dakota and the Fourteenth Amendment to the Constitution of the United States*

Newman argues that Section 24–17–11, N.D.C.C., is confiscatory and uncon-stitutional because it provides for no notice of hearing or opportunity for hearing.

Section 24–17–11 provides:

"Any advertising sign which violates the provisions of this chapter or the regulations adopted by the board is hereby declared to be illegal. The commissioner shall give thirty days' notice, by certified mail, to the owner thereof to remove the same if it is a prohibited sign, or cause it to conform to regulations promulgated by the board if it is an authorized sign. If the owner fails to act within thirty days as required in the notice, or if the commissioner is unable to ascertain the ownership of the sign, then such sign shall be deemed abandoned and the commissioner may remove such sign, and to this end he may enter upon private property for the purpose of removing such sign without liability for his actions."

The statute does not authorize summary seizure of private property, as contended by Newman, but, rather, authorizes the Commissioner to remove illegal signs only after 30 days' notice. The statute also provides the sign owner an opportunity to make those signs which are authorized under the chapter but do not conform to the standards set forth by statute or regulation, conforming signs.

Section 24–17–15, N.D.C.C., sets forth the procedure to be followed by a person aggrieved by a decision that a sign is illegal and must be removed. That procedure is by appeal pursuant to Sections 28–32–15 through 28–32–21. The 30-day-notice period allows sufficient time for the sign owner to submit his objections to the determination of illegality and to obtain a hearing, if so desired, before the district court prior to the removal of the sign. The sign owner might also seek a temporary restraining order or injunction to prevent removal pending appeal to the district court. We find that this procedure meets the constitu-

tional requirement of procedural due process.

*Issue 6–d: Whether Chapter 24–17 violates the First Amendment guarantee of freedom of speech*

 Newman relies on two recent United States Supreme Court cases for the proposition that commercial speech is fully protected under the First Amendment:

In *Bigelow v. Virginia,* 421 U.S. 809, 826, 95 S.Ct. 2222, 2234–2235, 44 L.Ed.2d 600, 614 (1975), the Court held that commercial speech is not stripped of all First Amendment protection; however, "Advertising, like all public expression, may be subject to reasonable regulation that serves a legitimate public interest. [Citations omitted.] To the extent that commercial activity is subject to regulation, the relationship of speech to that activity may be one factor, among others, to be considered in weighing the First Amendment interest against the governmental interest alleged." The holding in *Bigelow* limited First Amendment protection of commercial messages to those which are of "public interest."

In *Va. St. Bd. of Pharm. v. Va. Cit. Cons. Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the Court clarified the law regarding First Amendment protection of commercial speech by holding that it is not limited to speech of "public interest," but extends to advertising of a purely commercial nature. The Court did not, as argued by Newman, employ a strict scrutiny test in determining the question, but, rather, analyzed the case on "close inspection." It did not require the State to show a compelling State interest in justifying its action, but, instead, employed a balancing test. The Court emphasized that some regulation of commercial speech is permissible. It mentioned prohibitions not before the Court in that case which were not foreclosed by restrictions on the time, place, and manner of the commercial speech. The Court stated:

"We have often approved restrictions of that kind [time, place, and manner restrictions] provided that they are justified

without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information." 425 U.S. at 771, 96 S.Ct. at 1830, 48 L.Ed.2d at 363–364.

The Court concluded that the Virginia statute exceeded the bounds of reasonable regulation by singling out speech of a particular content (drug prices) and preventing its dissemination completely.

In the instant case, the statute does not purport to regulate speech on the basis of its content or completely prevent the dissemination of the same information by alternative means. Rather, the statute merely provides restrictions on the place and manner of erection of the outdoor advertising signs. Compare *Linmark Assoc., Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977).

The Supreme Court in *Va. St. Bd. of Pharm.* compared several cases which dealt with time, place, and manner restrictions on speech protected by the First Amendment. In *Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222, 232 (1972), a case involving picketing at a school, the Court recognized that

"The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.' . . . The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."

In *Kovacs v. Cooper,* 336 U.S. 77, 87, 69 S.Ct. 448, 453, 93 L.Ed. 513, 522 (1949), the Court held that regulation of sound trucks driving in a municipality was reasonable:

"We think it is a permissible exercise of legislative discretion to bar sound trucks with broadcasts of public interest, amplified to a loud and raucous volume, from the public ways of municipalities. On the business streets . . . such distractions would be dangerous to traffic at all hours useful for the dissemination of information, and in the residential thor-

oughfares the quiet and tranquility so desirable for city dwellers would likewise be at the mercy of advocates of particular religious, social, or political persuasions. We cannot believe that rights of free speech compel a municipality to allow such mechanical voice amplification on any of its streets."

In *Lehman v. City of Shaker Heights*, 418 U.S. 298, 302–303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770, 777 (1974), a case involving regulation of political placards on a public rapid-transit system, the Court stated:

"Although American constitutional jurisprudence, in the light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech, the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question."

The nature of the Interstate and primary highways in the State as public thoroughfares which carry a large volume of rapidly moving traffic through the many scenic areas of the State therefore is important in determining whether the regulations in the North Dakota statute are reasonable.

We must also consider the manner of expression. While billboard advertising does provide the traveling public with valuable information, it also has been recognized to be an intrusion on the privacy of those individuals who use the highways. This intrusive characteristic of outdoor advertising signs was emphasized by Justice Brandeis in *Packer Corporation v. Utah*, 285 U.S. 105, 110, 52 S.Ct. 273, 275, 76 L.Ed. 643, 647 (1932): "The radio can be turned off, but not so the billboard or street car placard." See also *General Outdoor Advertising Co. v. Department of Public Works*, 289 Mass. 149, 193 N.E. 799 (1935); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Bigelow v. Virginia, supra; Lehman v. City of Shaker Heights, supra* ; and *John Donnelly & Sons, Inc. v. Outdoor Advertising Bd.*, 339 N.E.2d 709 (Mass.1975).

Using the principles of the foregoing cases as our guide, we must balance the interests of the State against those of Newman. The State has an interest in providing a safe place for the users of the State highways. Although no empirical evidence was presented to either support or refute the relationship between billboards and traffic safety, we are not prepared to say that such a relationship does not exist, especially when the Legislature has found that it does. The nature of highway driving is such that the eyes of the driver may be diverted, sometimes subconsciously, from the road to the billboard. It is therefore reasonable to assume that the existence of highway billboards could have a detrimental effect on traffic safety.

The State also has an interest in protecting the privacy of those individuals who use the highways. As discussed above, several courts have recognized that highway users are, to some extent, a captive audience for those who wish to compete for their attention.

The State also has a legitimate interest in protecting, preserving, and enhancing the aesthetic quality of its land, as we mentioned above.

Newman has not presented any evidence or argument as to harm which will be occasioned by those who enter into its advertising contracts. In any event, the effect of such regulation is questionable in light of the varied network of communication available for the dissemination of such advertising messages, one such alternative means being the continuation of billboard advertising within the confines of the statutes.

The effect of the regulation on the public also is not subject to easy measurement since the same information which is presently conveyed on billboards ordinarily can be made available by the use of alternative means.

The interests of Newman are minimal in comparison with the public interest involved and the effect that the regulations have on the public and the businesses con-

tracting for advertising space is not so substantial as to outweigh the State's interest in providing a safe and visually pleasing environment.

In applying the criteria set forth in *Va. St. Bd. of Pharm., supra,* we find that Chapter 24–17, N.D.C.C., provides restrictions on the place and manner of outdoor advertising signs, which restrictions (1) are justified without reference to the content of the regulated speech, (2) serve a significant governmental interest, and (3) leave open ample alternative channels for communication of the same information.

*Issue 6–e: Whether Chapter 24–17 contains an unconstitutional delegation of power to legislate to a Federal administrator*

The Commissioner raised this issue in challenging the judgment of the district court, that the effective date of the North Dakota statutory regulation was suspended until January 19, 1972, the date the agreement between North Dakota and the Federal administrator was executed. Due to our finding that the effective date of the statutory regulation is January 1, 1968, this issue has been rendered moot.

The case is remanded to the district court for further proceedings consistent with this opinion.

ERICKSTAD, C. J., SAND and PAULSON, JJ., and HATCH, District Judge,* concur.